997 A.2d 856

**Mark E. FURDA**

v.

**STATE of Maryland.**

**No. 3053, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 2, 2010.

Walter S. Booth of Bethesda, MD, for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: DAVIS, HOLLANDER and MEREDITH, JJ.

HOLLANDER, J.

In this appeal, we must determine whether an involuntary hospital admission under Maryland law, for the purpose of an emergency mental health evaluation, constitutes a "commitment" under federal law, so as to bar the admittee's right to possess a regulated firearm in Maryland. The issue is rooted in events that began in February 2003, when the Montgomery County Sheriff's Department served a domestic protective order on Mark Furda, appellant, and transported him for an emergency mental evaluation, based on a petition filed by Karen Furda, who was then appellant's wife. At about the same time, the sheriffs seized numerous weapons from appellant's home, including regulated firearms.

On July 26, 2005, in the Circuit Court for Montgomery County, Furda pleaded guilty, as a subsequent offender, to one count of violating a domestic protective order issued in September 2004. See §§ 4–506 and 4–509 of the Family Law Article of the Maryland Code. The court sentenced Furda to a suspended one-year term of incarceration and two years of probation.

On September 13, 2006, while on probation in the protective order case, Furda filed a "Motion," pro se, in that case, seeking the return of his archery equipment and "other related items" that were seized in 2003. The court denied the motion, without prejudice, on November 1, 2006. On July 30, 2007, a few days after the expiration of his probation, appellant filed another pro se "Motion," asking for the "release of all [his] property held for safe keeping by the Montgomery County Sheriff's Department." Then, on October 31, 2007, through counsel, and before the court had ruled on the July

2007 Motion, appellant filed a "Motion To Return Property," requesting return of the weapons that had been seized in 2003.

After a hearing on November 7, 2007, the circuit court denied the Motion in an Order of the same date (docketed November 9, 2007). It concluded, *inter alia,* that appellant was prohibited from possessing firearms under 18 U.S.C. § 922(g)(4), because he had previously been "involuntarily committed to a mental institution. . . ." Appellant's Motion for Reconsideration, filed on December 3, 2007, was denied on January 16, 2008.

This appeal followed on February 13, 2008.[1] Appellant poses one question:

1. Did the Trial Court abuse its discretion by not granting Mr. Furda's Motion to Reconsider because Mr. Furda was not barred by Federal, Maryland State, or Montgomery County law from possessing firearms as he had never been "committed" within the definition of Federal law, Maryland State law, or Montgomery County law; and he did not have an adequate opportunity to respond to the State's allegations concerning whether he has been "committed" when it was raised for the first time just before the November 7, 2007 Motion argument?

---

1. Pursuant to Md. Rule 8–202(a), a notice of appeal must be filed within 30 days of the entry of the order or judgment from which the appeal is taken. However, a motion to exercise revisory power will not toll the time for filing an appeal unless the motion is filed within ten days of the judgment or order. *Alitalia Linee Aeree Italiane v. Tornillo,* 320 Md. 192, 200, 577 A.2d 34 (1990); *Unnamed Att'y v. Att'y Grievance Comm'n,* 303 Md. 473, 486, 494 A.2d 940 (1985); *Stephenson v. Goins,* 99 Md.App. 220, 221–22, 636 A.2d 481, *cert. denied,* 335 Md. 229, 643 A.2d 384 (1994); *Sieck v. Sieck,* 66 Md.App. 37, 41–42, 502 A.2d 528 (1986). *See also* Md. Rules 2–534, 2–535. When a revisory motion is filed beyond the ten-day period, but within thirty days, an appeal noted within thirty days after the court resolves the revisory motion addresses only the issues generated by the revisory motion. Because Furda filed his Motion for Reconsideration on December 3, 2007, more than ten days after the court denied the underlying Motion, the time for filing his appeal was not tolled. As a result, we only review the court's denial of appellant's Motion for Reconsideration.

The State has filed a Motion to Dismiss the appeal, based on several grounds.

For the reasons set forth below, we shall deny the State's motion, reverse the circuit court, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's former wife, Karen Furda, obtained a temporary protective order against appellant in February 2003. According to an "Incident Report" submitted on February 28, 2003, by a deputy in the Montgomery County Sheriff's Department,[2] Mr. Furda was served with "a temporary Protection Order" on February 27, 2003, at 11:00 p.m. See Furda v. Furda, Case No. 0601 SP006212003 (District Court for Montgomery County). He was also served with an order for an emergency mental evaluation, based on a petition filed by Ms. Furda.[3] Pursuant to Ms. Furda's consent, the Sheriffs searched the Furdas' home and recovered approximately fifteen rifles, one handgun, a large quantity of miscellaneous ammunition, knives, a bow, and arrows.

In the early morning of February 28, 2003, Furda arrived at Montgomery General Hospital (the "Hospital"). By the end of that day, he was transferred to Potomac Ridge Behavioral Health ("Potomac Ridge") for "involuntary admission," based on a certification by two physicians that "the individual presents a danger to the life or safety of the individual or of others." Furda was also described as having "a mental disorder and need[ing] treatment." A hearing to determine whether appellant would be released or detained involuntarily was set for March 4, 2003, at 9:30 a.m. However, Furda was

---

**2.** Two separate incident reports were attached to the "State's Response to Defendant's Motion for Returning Property (Firearms)." The second one was not submitted until October 28, 2003.

**3.** Neither the Petition nor the order approving it is included in the record. But, during the hearing on November 7, 2007, the parties agreed that the court granted the petition.

discharged from Potomac Ridge on March 4, 2003, at 10:56 a.m.[4]

According to the record, Ms. Furda obtained a Final Protective Order against Mr. Furda on March 6, 2003. It stated, in part: "While this Protective Order is in effect you may be subject to a federal penalty under the 1994 amendment to the Gun Control Act, 18 U.S.C. Section 922(g)(8), for possessing, transporting, or accepting a firearm."

Ms. Furda obtained another protective order on September 21, 2004. Then, on February 1, 2005, she filed an "Application for Statement of Charges," claiming that Mr. Furda "violated the protective order repeatedly. . . ." Thereafter, on March 3, 2005, Furda was charged in the Circuit Court for Montgomery County in a one-count Information with

> fail[ing] to comply with [the Protective Order] . . . dated September 21, 2004, issued under Section *4–506* of the Family Law Article, that ordered the respondent to refrain from contacting and attempting to contact Karen Furda, by contacting her in writing, and is a **subsequent offender,** in violation of Section 4–509 of the Family Law Article against the peace, government, and dignity of the State.

On July 26, 2005, appellant pleaded guilty to "Protective Order—Fail to Comply/Subsequent Offender," for which he received a suspended one-year term of incarceration and two years of probation. *See State v. Furda,* Case No. 101933, Circuit Court for Montgomery County. We shall refer to the domestic violence proceedings collectively as the "Protective Order Case."

On September 13, 2006, while Furda was still on probation in the Protective Order Case, he filed a pro se "Motion," seeking the return of his archery equipment and "other related items." According to the docket entries, the court denied the Motion, without prejudice, on November 1, 2006.[5] On July

---

**4.** The admissions to the Hospital and Potomac Ridge are discussed in more detail, *infra.*

**5.** We do not have a copy of the Order of November 1, 2006. However, the docket entries reflect that the court granted Furda "permission to possess a bow received as a birthday gift."

30, 2007, just after appellant completed his two-year probation in the Protective Order Case, appellant filed another pro se "Motion," asking for "the release of all of [his] property held for safe keeping by the Montgomery County Sheriff's Department." The State opposed the Motion. At a hearing on September 10, 2007, the court set October 31, 2007, as the deadline for filing memoranda, and scheduled a hearing for November 7, 2007.[6]

On October 31, 2007, through counsel, appellant filed a "Motion To Return Property," with an accompanying Memorandum of Law. He asserted that "there is nothing in Maryland Law or Federal Law barring [appellant] from possessing firearms." In its opposition, the State said, in part:

8. The Defendant is a prohibited person under Federal Law and therefore, cannot possess a Firearm. Title 18 U.S.C. Section 922(g)(4) prohibits *"a person who has either been adjudicated as mental defective or have [sic] been committed to a mental institution."* 18 U.S.C. 922 does not state a set period of time that the person must be committed to such institution. (Emphasis in original).

9. The State has sent subpoenas to Potomac Ridge Behavioral Health Center to bring certified copies of medical records of the Defendant's involuntary commitment via EPP[7] on February 28, 2003. Karen Furda, the Defendant's wife at the time, would testify that the Defendant was committed to Montgomery General Hospital on the 28th and was transferred later that day to Potomac Ridge where the Defendant remained until he was discharged on March 4, 2003.

The court held a hearing on November 7, 2007, at which non-testimonial evidence was presented. Appellant appeared at the hearing.

---

**6.** We do not have a transcript for the hearing on September 10, 2007.

**7.** We assume that EPP is a typographical error; the record suggests that EEP is an abbreviation for Emergency Evaluation Petition.

Appellant's counsel explained that appellant was seeking the return of all items seized by the Sheriff in 2003, with the exception of his "Browning 30–caliber," which the parties acknowledged was illegal for appellant to possess. Appellant's attorney argued that, given the expiration of both the probation and the protective order, "there's absolutely nothing in Federal law, State law, or local law that would bar him from owning, possessing firearms."

Based on Mr. Furda's medical records, admitted without objection as State's Exhibit 1, the State urged the court to find that appellant was prohibited from possessing weapons under 18 U.S.C. § 922(g)(4). Further, the State argued:

I don't believe the Court has jurisdiction at this time. The probation was fully terminated at the end of July, I think it was and I put in here July 26 was the end of his probation. Mr. Furda did not file this until July 30th. Now I know it's four days, but still, probation the case was done, so I believe that at that point there was no active criminal case and this was filed under the original Criminal Case of 101933 and therefore it was a closed case, the Court does not have jurisdiction. And I would ask that because of the fact he failed to file this within the appropriate time while there was still an active case, you do not have jurisdiction to make this decision.

According to the State, "Mr. Furda was told on multiple occasions by Lieutenant Rhinestat ... from the Sheriff's Department that he had a certain procedure he had to follow to file for return of his guns." The State insisted that the required procedure "was to file a written application with the Sheriffs Department and then they would have to look to Federal and State law to determine if, in fact, he was allowed to have them back, and if he was, then they would give them back to him." The following exchange ensued:

THE COURT: What is the statutory authority for the procedure that the Sheriff's Office follows that Lieutenant Rhinestat told Mr. Furda, this is what you have to do. Where is that set out statutorily?

[THE PROSECUTOR]: I believe it's their own policy and again, I apologize for Lieutenant Rhinestat could not be here today, and I actually was going to have Lieutenant Bean here as well. It's my understand [sic] that there is just like Mr. Furda were to go to Gilbert Guns and apply, by Federal law they have to do a background check, and that's what the Sheriff's Office would do. They would be essentially like Gilbert Guns. They would have to do a background check to determine if legally they can turn them over to him, and it would be my position and that was the second prong of the argument, that he would be prohibited from having them period under Federal law due to the fact he was put in—

THE COURT: Well I guess what I'm asking is this, there's no statutory scheme that tells him, first you must go to the Sheriff, then once the Sheriff—

[THE PROSECUTOR]: No, Your Honor.

THE COURT: Refuses to release the gun, then you can request judicial review of that decision either you know, in whatever court location.

[THE PROSECUTOR]: Sure. No, I don't believe in good faith that when he filed it, he wasn't relying on *the original decision that was that you held this open, the issue of the guns,* and two, he was told how to do this after his probation ended and he didn't.

THE COURT: Well they weren't going to give them to him. So he would have ended up here sooner or later.

[THE PROSECUTOR]: Well then maybe we cut to—

THE COURT: So we might as well look at the legal issues.

[THE PROSECUTOR]: Well that was his—

THE COURT: *And he was told . . . by the State, he filed it prematurely. You have to wait until you're off probation, then you can come back to court and ask for these, so I think what we have to address is the merits.*

[THE PROSECUTOR]: *Sure.*

THE COURT: Is he legally prohibited from getting these back and not about, sort of I'd say, the technicalities of is

his probation closed and was he a day late or, because he's been told that all along.

[THE PROSECUTOR]: I understand.

THE COURT: To get them back you're going to have to file for them because we're not giving them to you.

[THE PROSECUTOR]: And again, Your Honor, I have to throw all my arguments out to you.

THE COURT: Sure.

[THE PROSECUTOR]: And that's why, then we look at the State law, is he a prohibitive [sic] person. . . . [T]hen you look at the more serious level which is the Federal level and there it's very clear, they don't have a specific time period where the State is very clear on saying that a person must spend at least 30–days in a mental institution. The Federal law doesn't even refer to that altogether, it just says, a person who's either been adjudicated as mental defective, or has been committed to a mental institution.

(Emphasis added.)

Appellant's counsel insisted that appellant was not "committed" under federal law. Rather, appellant was merely "evaluated." [8]

The State countered:

> The fact was, is that he was transferred and was committed to Potomac Ridge and there was a diagnosis, and Ms. Furda . . . could testify as to what the diagnosis of schizophrenia was. It is a commitment and the evaluation, as Mr. Booth is referring to, is from the Montgomery General Hospital and that point [sic], he was involuntary committed further for treatment for Potomac Ridge.

According to the medical records, admitted in evidence, Furda, then 37 years old, was brought to the Hospital at 2:30

---

**8.** Appellant's counsel also challenged the application of Montgomery County Code § 57–9(d), which bars possession of weapons if one "has been confined to any hospital or institution for treatment of a mental disorder or for mental illness." He argued that "the whole field of firearms regulation belongs to the State, not to the County."

a.m. on February 28, 2003, based on a petition for an emergency evaluation filed by his wife. Appellant's "Thought Content" at the Hospital was described as "Organized" and his "Mood" was described as "Frustrated." His "thinking" was described as "clear and logical," with "no delusions/hallucinations." Under "Formulation," the record noted that appellant was "found to be stable," although his wife reported that Furda was "suicidal and homicidal. . . ." It also stated: "Pt is not willing to consent to voluntary admission for further evaluation and assessment."

Doctor Behl examined Furda and "recommended inpatient treatment with a provisional diagnosis of Bipolar Disorder." According to a Maryland form entitled "Involuntary Admission To Mental Health Facility Pursuant to [H.G.] 10–631, 10–632," two physicians certified that appellant's "involuntary admission" was sought because "the individual presents a danger to the life or safety of the individual or of others." A section of the Hospital record, entitled "Disposition," stated: [9]

Case transferred to Kevin Simms for completion after Dr. Behl [of the Hospital] has seen the pt. Addendum: 2/28/02. The patient was also assessed by Dr. Behl who also recommended inpatient treatment with a provisional diagnosis of Bipolar Disorder. She signed one certificate. Four days of inpatient treatment was authorized by Stewart Smith of Magellan. . . . Two [sic] Admit to Patomac [sic] Ridge on Two physicians certificates. KPS.

As discussed, appellant was then transferred to Potomac Ridge. Although a hearing was scheduled to determine whether appellant would be released or detained, the record does not reflect that a hearing ever took place. Appellant was discharged from Potomac Ridge on March 4, 2003, at 10:56 a.m.[10] Joseph Marnell, M.D., of Potomac Ridge, prepared a Discharge Summary that stated, in part:

---

**9.** The initials "KPS" appear at the end of the typed portion of the Disposition. Simms's signature also appears on the document.

**10.** The record contains numerous references to appellant's discharge on March 4, 2003. However, on one occasion the record reflects a

The patient presents as extremely shallow but cooperated. His speech and thinking were pressured and paranoid. He was preoccupied and obsessed about his wife's infidelity. Nonetheless, he minimized his substance abuse and aggressive behaviors. He minimized any threats that he might have made to kill himself or his family, indeed, although he talked about holding a gun, he adamantly denied ever having threatened anyone with it.

\*     \*     \*

CONDITION ON DISCHARGE:

The patient refused to sign in on a voluntary basis. I was confronted with the dilemma of whether to try to pursue an involuntary commitment against him as the hearing was to occur on the day of discharge. The patient, throughout this hospital stay, was behaviorally appropriate. His mood had stabilized. His speech and thinking were better organized and were no longer pressured. He no longer demonstrated any paranoid thinking and was ruminating less about his wife's infidelity. He acknowledged a need for substance abuse rehab and agreed to go to IOP and to take Zyprexa for any residual effects of amphetamine-induced psychosis. I emphasized, however, that the patient presents as very shallow. His behavior and attitude seems to be geared more for getting out of the hospital than it is for true rehab. The patient and I reviewed how he is absolutely 100% responsible for his actions, including any consequences for behaviors that he does following his discharge. This includes any behavior linked to relapse and to substance abuse. Nonetheless, I have no grounds for detaining the patient at this time. There is no evidence of psychosis, confusion or withdrawal. He denies being suicidal or homicidal. He is behaviorally appropriate on the unit. His mood has stabilized. He is responsible for his actions. He knows the aftercare plan. He knows we will be contacting

discharge date of March 5, 2003. In addition, Dr. Marnell signed the Discharge Summary on March 13, 2003.

Child Protective Services. The police still have the weapons.

The diagnosis on discharge included "Psychosis, NOS, probably drug-induced. Amphetamine Dependence."

At the motion hearing on November 7, 2007, the court addressed the items that had been seized by the Sheriffs in 2003, as documented in the "Seized Property/Evidence Log." [11] The parties agreed upon the release of various items that did not constitute prohibited "firearms." As to the remaining items, the court took the matter under advisement.

On November 7, 2007, the court issued an "Order" (docketed November 9, 2007) denying appellant's motion for the release of his personal property. The court said, in part:

> The items at issue were seized at the time a Domestic Violence Protective Order was served on [appellant].... The Protective Order is now expired and probation arising from a related criminal case is now closed.

> Upon the evidence presented, the Court finds that Defendant Mark Furda is considered a prohibited person under 18 U.S.C. Section 922(g)(4) as a result of having been involuntarily committed to a mental institution and is thereby prohibited from possessing firearms.

On December 3, 2007, appellant filed "Defendant's Motion For Re–Consideration" [sic], contending that his evaluation at Potomac Ridge did not constitute a commitment under 18 U.S.C. § 922(g)(4). Furda insisted that "an evaluation is not an adjudication as a mental defective, nor is being temporarily held for purposes of evaluation, the equivalent of having been committed." Appellant also argued that his "time in the hospital and at Potomac Ridge also does not constitute a commitment under Maryland law." He noted that the doctor stated: " 'I have no grounds for detaining the patient at this

---

11. There are many dates on the Evidence Log. The earliest one corresponds to the events of February 27, 2003.

time.'" Moreover, no hearing was ever held, as required for an involuntary commitment.[12]

On January 16, 2008, the court denied appellant's motion for reconsideration. Appellant filed an appeal in the Protective Order Case on February 13, 2008.

In the meantime, on January 24, 2008, appellant went to Gilbert's Guns and completed an application to purchase a regulated firearm. In the application, he represented, under oath, that he had never been committed to a mental institution. As a result, he was charged in the Circuit Court for Montgomery County with perjury, in violation of Md.Code (2002, 2007 Supp.), § 9–101(a)(2) of the Criminal Law Article ("C.L."), and giving false information or making a material misstatement in a firearm application, in violation of Md.Code (2003, 2007 Supp.), § 5–139(a) of the Public Safety Article ("P.S."). *See State v. Furda*, Case No. 110008 (the "Perjury Case"). Following a bench trial in 2008, the circuit court convicted appellant of both charges and sentenced him to ten years' incarceration, with all but five years suspended. The Perjury Case is the subject of a companion appeal. *See Furda v. State*, 194 Md.App. 1, 1 A.3d 528 (2010).

On October 29, 2008, the State filed a motion to dismiss the appeal in the Protective Order Case, claiming that appellant was not entitled to a direct appeal because his appeal arose from a guilty plea. It said: "As such, the appropriate avenue for review is an application for leave to appeal, which Appellant neglected to pursue." Appellant responded that "this appeal is a civil appeal...." On November 18, 2008, this Court denied the State's motion to dismiss, without prejudice.

In its brief, the State renewed and expanded its motion to dismiss the appeal. It argued that "the circuit court lacked

---

**12.** Appellant again asserted that he was not "committed" under County Code § 57–9(d). On appeal, the State "agrees with Furda that Montgomery County Code 57–9(d) is preempted by State law." Moreover, we observe that the State does not argue in its brief that, based on the emergency evaluation, appellant was prohibited from possessing a firearm under Maryland law.

jurisdiction to decide Mr. Furda's Motion To Return Property and motion for reconsideration," because "the criminal case to which Mr. Furda appended his motion terminated before he filed the motion." In addition, it maintained that appellant should have filed a replevin action in District Court. And, it maintained that appellant was required to seek leave to appeal. Alternatively, the State urged this Court to dismiss the appeal as moot, claiming appellant's convictions for perjury and false statement now render him ineligible to possess a firearm, without regard to the commitment issue. The State has also asked us to dismiss on the ground that appellant failed to exhaust his administrative remedies in connection with seeking the return of his weapons.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

As noted, the State has moved to dismiss the appeal on various grounds. Noting that appellant filed his motion for return of property on July 30, 2007, i.e., after the termination of his probation, the State asserts: "Termination of the period of incarceration, parole, or probation divests the court of jurisdiction." The State also argues, for the first time on appeal, that appellant's motion for return of property was essentially an action for replevin, for which only a District Court has jurisdiction under Md.Code (2006 Repl. Vol.), § 4–401 of the Courts and Judicial Proceedings Article ("C.J."). It quotes State v. Walls, 90 Md.App. 300, 305–06, 600 A.2d 1165 (1992), for the proposition that " 'forfeiture is a civil in rem proceeding against property, unconnected with any criminal proceeding against the owner or holder of the property.' " In the State's view, "because Furda improperly filed his petition for return of property in the criminal action, the circuit lacked subject matter jurisdiction to decide it."

In addition, the State argues that, even if the circuit court had jurisdiction, "this appeal is not properly taken" because "[i]n a case involving a guilty plea ... [t]he only avenue of

relief is an application for leave to appeal." It asserts: "Because Furda seeks review of a denial of a motion for reconsideration in his criminal case by direct appeal—without seeking leave—this appeal should be dismissed."

Further, the State alleges that, "[e]ven if there were no jurisdictional or procedural barriers to Furda's appeal, the appeal should be dismissed as moot," because appellant's perjury and false statement convictions "render him ineligible to possess firearms." Lastly, the State argues that the circuit court did not have jurisdiction over Furda's motion because Furda was required first to pursue "informal" administrative remedies under Md.Code (2001, 2007 Supp.), § 13–201 through 13–206 of the Criminal Procedure Article ("C.P."), governing forfeiture in gun cases.

In reply, appellant argues:

[T]his is a collateral matter stemming from the criminal action. As a matter of clean hands, the [State's] position is unacceptable because on several occasions Mr. Furda by himself, as well as through his attorneys, raised the issue of the return of firearms and was told by both the Montgomery County State's Attorney's Office, as well as by the Judges of the Montgomery County Circuit Court, that as long as he was on probation he could not have a firearm, and therefore, completion of his probation would be the first opportunity for him to request their return.

Furda also argues: "Montgomery County Police retained the firearms through the probation period. Mr. Furda was informed that as soon as probation was over he should file the appropriate Motion (in the Circuit Court criminal case) to recover his property, and Mr. Furda proceeded in this manner as directed." Noting that the State never initiated forfeiture proceedings as to the weapons, he asserts: "Instituting a forfeiture proceeding is not the job of the property holder; it is the duty of the State if they want to retain the property of one of its citizens."

Furda also rejects the State's claim that he should have filed a replevin action in the District Court. He asserts:

"There is a statutory scheme for the recovery of firearms as contained in the regulated firearms section of the Maryland Code."[13]

In addition, appellant maintains that he "is not appealing his guilty plea pertaining to failure to comply with a Protective Order." Furda elaborates:

[H]e is appealing a collateral matter to the guilty plea—the denial of the Motion for Reconsideration of the Order denying his [motion seeking the return of his personal property]. Mr. Furda did not even begin the process of attempting to recover his property until after the successful completion of his two years of probation (as he was directed by the Court); thus his Motion seeking the return of his firearms, and this subsequent appeal are unrelated to the guilty plea itself.

Disputing the State's claim that the matter is moot based on the perjury conviction, appellant responds:

Mr. Furda maintains a property interest in this property. There is no doubt, and there is no argument by anyone, that these firearms are the property of Mr. Furda despite the fact that Mr. Furda is not in possession of the items. It is certainly not argued here (and was not argued below) that Mr. Furda possesses them or that the police do not possess them. Thus, his property interest has not been extinguished, and his attempt to get the property back is not moot.

Appellant also challenges the State's assertion that his perjury and false statement convictions precluded the court from providing him any relief. In his view, the State is "putting the cart before the horse." At the time of the denial of the Motion for Reconsideration, Mr. Furda had not been convicted of perjury. This perjury conviction is based

---

**13.** Appellant did not cite a statute. We assume that he is referring to Md.Code (2006 Repl. Vol., 2009 Supp.), § 4–506.1 of the Family Law Article, titled "Surrender of firearm; retake of possession." It was enacted in 2009. *See* n. 15, *infra.*

entirely on the Order of November 9, 2007. To argue that the perjury conviction renders the first appeal moot, and then to turn around and use that very document to affirm Mr. Furda's perjury conviction puts him into a legal loop. The draconian result would be that the first appeal ... gets dismissed because he is now a convicted perjurer, and then the Order from the first appeal is used to convict him of perjury, and then *this* Court affirms that conviction ... based upon the validity of that Order. This presents Mr. Furda with a legal conundrum, and a classic "Catch 22" from which no Appellant could free himself.

Citing *Serio v. Baltimore County*, 384 Md. 373, 863 A.2d 952 (2004), in which the Court recognized an owner's continuing interest in weapons that he could not possess, appellant argues that, as an alternative to obtaining the return of his firearms, "he certainly may have the property signed over to a licensed [gun] dealer ... and at least reap the financial benefits from a sale of his property." Moreover, appellant argues that, in the event of a remand, "[t]he Circuit Court could review this issue and actually conduct a hearing with live testimony, real exhibits, and make a determination on the merits rather than on the basis of 15 minutes of argument."

Following oral argument on September 1, 2009, we requested supplemental briefing from the parties on the jurisdiction issue. In his memorandum, appellant stated that he "was unable to find any statutory or case-law authority that would specifically grant a Trial Judge the direct authority to entertain" a motion for the return of his weapons under the circumstances of this case. But, appellant noted that the court may be able to retain jurisdiction over this matter, "pursuant to a Petition for Writ of Error Coram Nobis, Md.Code. Ann. Crim. Pro. § 7–106, and other post conviction relief, as long as collateral consequences remain as a result of the conviction." In addition, appellant argued: "[T]he Court could also rely upon the general grant of authority as contained in the Courts and Judicial Proceedings Article of the

Md.Code, which asserts that the Circuit Court is a court of general jurisdiction."

According to appellant, if we find "that none of the above provisions granted the Circuit Court authority; then, without full and proper authority, the Order of November 7, 2007 becomes null and void." He maintains that such a finding "would in essence, be granting Mr. Furda's appeal, because a primary contention of his Appeal in Case No. 3053, is that the Denial of the Motion for Return of Property in the Order of November 7, 2007 was not valid under Maryland law."

In its memorandum, the State posited that C.J. § 4–401(2) and § 1–501 collectively "vest[ ] exclusive jurisdiction of replevin actions in the district court ... [and] divest[ ] the circuit court of jurisdiction to hear" this case. It argued that "the statutory scheme for forfeiture of handguns," found in C.P. § 13–201 through 13–206, "specifically provides for informal administrative review of claims for release of handguns, and, if warranted, subsequent judicial review...."

The State acknowledged that dicta in *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675 (D.Md.2006), *aff'd in part*, 519 F.3d 216 (4th Cir.2008), "supports Furda's position that he could have moved to retrieve his firearms in the circuit court...." But, according to the State, even if *Mora* stands for the proposition that the circuit court has subject matter jurisdiction in certain cases where a person seeks return of property seized by the Government, this case is not one of them, "[b]ecause Furda failed to follow the statutory judicial review requirements and Maryland Rules governing civil actions, and instead improperly filed a motion in a criminal case having nothing to do with the firearms he sought to retrieve...." In its view, "the circuit court did not possess jurisdiction to adjudicate his claims."

Moreover, the State asserts that Furda's motion was arguably a civil action for declaratory judgment for mandamus, for which the circuit court had to establish personal jurisdiction over the "proper defendant, the Montgomery County Sheriff." It explains:

Here, none of the requirements for instituting a civil action was satisfied. There was no complaint. No summons and complaint were served upon the custodian of the firearms, the Montgomery County Sheriff. Nor was process served upon any County representative.... Thus, there was no jurisdiction over the custodian of the firearms, and the circuit court had no authority to adjudicate Furda's claim.

As we see it, the State's primary contention—that the court lacked jurisdiction because appellant's probation had come to an end—is the proverbial "Catch 22." The State concedes that, "[a]rguably, when Furda went before the court to seek return of his firearms in 2006, when Furda was still on probation, the circuit court *did* have jurisdiction to hear that motion." (Emphasis in original). Yet, at that time the State apparently took the position that the motion was premature, because Furda was still on probation. Evidently, it persuaded the court that such a motion had to await the conclusion of probation. Appellant abided by the State's position, and promptly filed another motion as soon as his probation ended. Then, the State claimed that the motion was too late, because appellant's probation had expired.

As the court below recognized, appellant was instructed to make his request at the end of his probation; that is what he did. At the very least, it seems disingenuous for the State to now complain about appellant's compliance with the State's instructions.

It is also disingenuous for the State to argue that the circuit court lacked jurisdiction to decide the motion for return of property, given that the court's denial of that motion was central to the State's subsequent prosecution of Furda in the Perjury Case. If the court lacked jurisdiction to consider appellant's motion for the return of his weapons, it would seem that the court also lacked jurisdiction, in the very same case, to find that appellant had previously been committed. Yet, it is that ruling on which the State relies in urging us to uphold the Perjury Case. The State cannot have it both ways.

*Cf. Roebuck v. State,* 148 Md.App. 563, 593–94, 813 A.2d 342 (2002) (noting that in separate trials of co-defendants, the State took inconsistent positions with regard to the reliability of a custodial statement, and stating that the trial court should have considered the State's reliance on the statement in the one case when assessing the State's objection to that statement in the other case), *cert. denied,* 374 Md. 84, 821 A.2d 371 (2003).

■ In any event, we are unaware of any authority that bars a court from returning property to a probationer after the probationer has complied with his conditions of probation. To be sure, "in the absence of a probation violation, a court does not have jurisdiction to extend the term of probation after the original term of probation has expired." *Carter v. State,* 193 Md.App. 193, 214, 996 A.2d 948 (2010). But, this is not an extension of probation case.[14]

We also reject the State's assertion that Furda filed his motions to obtain his firearms "in a criminal case having nothing to do with the firearms he sought to retrieve...." The weapons were seized in connection with the temporary protective order issued in February 2003. The weapons had not been returned by the time appellant pleaded guilty on July 26, 2005, to a charge of violating another protective order. Moreover, the probation order in that case instructed him to "[g]et permission from *the court* before owning, possessing, using, or having under your control any dangerous weapon or firearm of any description." (Emphasis added.) The State never initiated forfeiture proceedings as to the property in issue, and acknowledged below that there was no statutory

---

14. Similarly, the State's reliance on *Obomighie v. State,* 170 Md.App. 708, 908 A.2d 132, *cert. denied,* 396 Md. 13, 912 A.2d 649 (2006), is not persuasive. In that post conviction case, we recognized that a defendant was not entitled to relief after his probation expired. *Id.* at 711, 908 A.2d 132. But, that conclusion was founded on the statutory text. Here, we are not governed by a statute that precludes appellant's motion.

scheme in place at the time that governed how appellant was to go about seeking return of the weapons.[15]

In any event, we conclude that the circuit court had jurisdiction to decide appellant's Motion To Return Property, and that the motion is not moot. We explain.

C.J. § 1–501 provides:

### § 1–501. Jurisdiction and powers in general.

The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal.

---

**15.** Maryland Code, Family Law Article [F.L.] § 4–506.1, was enacted in 2009, and took effect on October 1, 2009. *See* 2009 Md. Laws, Ch. 491. F.L. § 4–506.1 provides:

### § 4–506.1. Surrender of firearm; retake of possession.
(a) *Duties of law enforcement officer upon surrender.*—If a respondent surrenders a firearm under § 4–505 [pursuant to a temporary protective order] or § 4–506 [pursuant to a final protective order] of this subtitle, a law enforcement officer shall:

(1) provide to the respondent information on the process for retaking possession of the firearm; and

(2) transport and store the firearm in a protective case, if one is available, and in a manner intended to prevent damage to the firearm during the time the protective order is in effect.

(b) *Retake possession; exception.*—(1) The respondent may retake possession of the firearm at the expiration of a temporary protective order unless:

(i) The respondent is ordered to surrender the firearm in a protective order issued under § 4–506 of this subtitle; or

(ii) the respondent is not otherwise legally entitled to own or possess the firearm.

(2) The respondent may retake possession of the firearm at the expiration of a final protective order unless:

(i) the protective order is extended under § 4–507(a)(2) of this subtitle; or

(ii) the respondent is not otherwise legally entitled to own or possess the firearm.

By way of analogy, C.P. § 1–203(d)(1) expressly provides circuit courts and district courts with jurisdiction to entertain a motion for the return of property "seized under a search warrant." It states:

> (d) *Return of property rightfully taken and wrongfully withheld.*—(1) A circuit court judge or District Court judge shall cause property rightfully taken under a search warrant to be restored to the person from whom it was taken if, at any time, on application to the judge, the judge finds that the property is being wrongfully withheld after there is no further need for retention of the property.

In this case, of course, the weapons were not seized pursuant to a search warrant. But, the fact that a statute authorizes a court's consideration of a request if property is seized under a warrant does not mean that the lack of a statute precludes the court's consideration of a request for the return of property seized without a warrant. *Cf. State v. Smullen,* 380 Md. 233, 248–49, 844 A.2d 429 (2004) (recognizing defense of battered child syndrome, despite the absence of a statute, by analogy to statutory defense of battered spouse syndrome). Indeed, in *Mora v. City of Gaithersburg,* 462 F.Supp.2d 675, 695–96 (D.Md.2006), *aff'd in part,* 519 F.3d 216 (4th Cir.2008), the federal district court recognized the appropriateness of extending the court's jurisdictional reach beyond the literal text of C.P. § 1–203(d)(1).

In *Mora,* the plaintiff, a licensed gun collector, claimed he was subjected to an unlawful search and seizure, and that the many weapons that he lawfully possessed were taken from him without a warrant.[16] *Id.* at 680–81. He sued the City of Gaithersburg, members of two police departments and the Sheriff's Department, under 42 U.S.C. § 1983, alleging depri-

---

16. Mora was taken for an emergency psychiatric evaluation under Md.Code (2000 Repl. Vol.), § 10–622 of the Health–General Article ("H.G."), first at Shady Grove Adventist Hospital and then to Potomac Ridge. The court noted that "he was evaluated, [but] was never formally committed...." *Id.* at 681.

vation of property without due process. *Id.* at 680. Of import here, the federal trial court said, *id.* at 695:

> In this case, the Court has concluded that Defendants have exceeded their authority under state law in detaining Mora's property. Even so, it is clear that at all times Mora has had recourse to Maryland's circuit courts and/or its district courts to secure return of his property. . . .

In rejecting Mora's claim of a denial of due process, Judge Messitte looked to the logical extension of C.P. § 1–203(d)(1), and said, *id.* at 695–96:

> It can hardly be the case that an individual whose property was rightfully seized under a warrant and thereafter wrongfully detained would have access to a reasonable post-deprivation remedy for its return, while an individual whose property was seized without a warrant but pursuant to a valid search incident to an arrest or a consent search would have none. More to the point, it would be altogether anomalous that a party whose property was seized without a warrant would only have recourse to a federal civil rights action to vindicate his claim. In the end, warrantless searches validly conducted pursuant to a recognized exception to the warrant requirement essentially equate to searches conducted pursuant to a warrant. Certainly Maryland circuit courts, in the exercise of their general jurisdiction, Md.Code Ann., Cts. & Jud. Proc. § 1–501, or district courts in the exercise of their replevin jurisdiction, *id.* § 4–401(2), could entertain Mora's claim and order immediate return of the detained property rightfully taken and wrongfully detained. All this is to say that, from the outset, prompt judicial review has been available to Mora, to consider his options, but "[f]or his part . . ., [he has] found it unnecessary even to enter upon, let alone travel the entire length of, that road." *Amsden v. Moran,* 904 F.2d [748] at 755 [1990]. Because this avenue has been open (and still remains open), Mora cannot plausibly maintain that he has been denied the procedural process due him under the Constitution, even if Defendants have incorrectly acted beyond their authority.

As to that issue, the Fourth Circuit agreed. It said, 519 F.3d at 230 n. 2 (emphasis added):

> Besides his tort claims for trespass to chattels and conversion, Mora might invoke Maryland's statutory right to the return of property "rightfully taken under a search warrant" but "wrongfully withheld after there is no further need for retention of the property." Md.Code Ann., Criminal Procedure § 1–203(d)(1) (LexisNexis 2001). *Although this provision technically applies only where property was taken under a warrant, it seems unlikely that a court would refuse to apply it to property rightfully taken and wrongfully withheld under an exception to the warrant requirement.*

Here, according to the 2003 Incident Report, Ms. Furda consented to a search of the home for weapons. Numerous weapons were discovered in the basement of the house and were "transported to the [Office of the Montgomery County Sheriff] and stored in accordance with office policy." Quoting from *Mora*, "warrantless searches validly conducted pursuant to a recognized exception to the warrant requirement essentially equate to searches conducted pursuant to a warrant." *Mora*, 462 F.Supp.2d at 695. Therefore, we are satisfied that "Maryland circuit courts, in the exercise of their general jurisdiction ... or district courts in the exercise of their replevin jurisdiction ... could entertain" Furda's claim for the return of the weapons. *Id.* at 695–96.[17]

For many of the same reasons, we also agree with appellant that he did not need to file an application for leave to

---

17. C.J. § 4–401(2) provides: "Except as provided in § 4–402 of this subtitle, and subject to the venue provisions of Title 6 of this article, the District Court has exclusive original civil jurisdiction in ... [a]n action of replevin, regardless of the value of the thing in controversy...." *See also* Md. Rule 12–601(a). Replevin is appropriate " 'in all cases where the object of the suit is to recover possession of specific goods and chattels, to the possession of which the plaintiff claims to be entitled at the time of instituting the suit.' " *Wallander v. Barnes*, 341 Md. 553, 561, 671 A.2d 962 (1996) (citation omitted). But, in the context of this case, replevin was not the only remedy available to appellant.

appeal under C.J. § 12–302(e) in order to pursue this issue on appeal. C.J. § 12–302(e) "does not permit an appeal from a final judgment entered following a plea of guilty in a circuit court. Review of such a judgment shall be brought by application for leave to appeal." Appellant's appeal does not implicate his guilty plea to the charge of violating a Final Protective Order. Rather, he has appealed the court's denial of his motion for reconsideration as to his request for the return of his weapons, which were held as a consequence of that case. The court denied his motion for the return of property because it found that appellant was a "prohibited person under 18 U.S.C. Section 922(g)(4) as a result of having been involuntarily committed to a mental institution...."

■ Nor are we persuaded that appellant first had to pursue administrative remedies; the record does not reflect that the administrative process cited by the State was triggered. C.P. § 13–203 obligates the seizing authority to notify the owner of his right to apply for a review as to his qualification to possess a handgun. However, the State never introduced evidence that proper notice was furnished to appellant by the seizing authority.

■ Finally, we agree with appellant that the matter is not moot. Even if Furda's perjury conviction renders him ineligible to possess his firearms, *Serio, supra,* 384 Md. 373, 863 A.2d 952, suggests that appellant retains a property interest in the firearms. We explain.

Serio was convicted of "manslaughter by automobile," a felony under Md.Code (1957, 1996 Repl. Vol., 1998 Cum. Supp.), Art. 27, § 388. *Id.* at 378, 863 A.2d 952. On the same day that he was sentenced, Baltimore County police obtained a search warrant and seized numerous firearms from Serio's home, alleging that he was a felon in possession. *Id.* at 378–79, 863 A.2d 952. Although Serio was not charged as a felon in possession, the County refused to return the firearms to Serio, or to sell them and give him the proceeds. Serio subsequently filed a five-count complaint against the County and one of the police officers who seized his firearms, seeking

the return of his seized property. *Id.* at 379, 863 A.2d 952. Later, Stanski was added as a plaintiff, claiming he intended to purchase the seized firearms. *Id.* at 380, 863 A.2d 952. After further amendment of the suit, related federal court proceedings, and other state court proceedings, the trial court granted the defendants' motion for summary judgment with respect to the counts in which Serio requested the return of his firearms. *Id.* at 385, 863 A.2d 952. At a show cause hearing held two months later, to consider the return of the firearms, the court ruled that "the seized firearms and related items could not be returned to Serio or given to Stanski [his designee] for disposal because doing so would allow 'the defendant or claimant to profit by what he cannot possess legally.' " *Id.*

The Court of Appeals reversed. Although Serio, as a convicted felon, "is not permitted to possess the firearms," the Court recognized that "he retains an ownership property interest in them...." *Id.* at 396, 863 A.2d 952. The Court added that *Serio* was entitled to due process protections under Article 24 of the Maryland Declaration of Rights, which states that, "no man ought to be ... deprived of his ... property, but by the judgment of his peers, or by the Law of the land." *Id.* The Court reasoned, *id.*: "[W]hether Serio's firearms are viewed as derivative contraband ... or as property that is incapable of possession because of Serio's status as a convicted felon, Serio is not divested of his ownership interest, and the County cannot just retain the firearms." Moreover, the Court noted that, "[w]hen property has been physically appropriated by a governmental entity from a property owner, the government must 'justly' compensate the property owner." *Id.* at 399, 863 A.2d 952. In addition, the Court said: "The full monetary equivalent to compensate a person deprived of his property interests by the government is based upon the fair market value of his property ... which in the present case may be realized through a court ordered sale of the firearms...." *Id. See* Md. Rule 14–301.

Under *Serio,* appellant's motion is not moot; regardless of the perjury conviction, he may have a right to a court-ordered sale of his weapons.

■■■ Alternatively, even if the case is moot, it is worthy of our consideration because of the public importance of the issue of whether an emergency mental health evaluation constitutes a commitment.

■■■ "A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951 (1996); *see Hill v. Scarlascini,* 134 Md.App. 1, 4, 758 A.2d 1087 (2000). As a general proposition, "appeals which present nothing else for decision are dismissed as a matter of course." *In re Riddlemoser,* 317 Md. 496, 502, 564 A.2d 812 (1989). This is because any decision as to such an issue would amount to an academic undertaking; appellate courts "do not sit to give opinions on abstract propositions or moot questions...." *Id.* See generally *Board of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027 (1999); *Mercy Hosp., Inc. v. Jackson,* 306 Md. 556, 562, 510 A.2d 562 (1986); *Atty. Gen. v. Anne Arundel Co. Sch. Bus Contractors Ass'n, Inc.,* 286 Md. 324, 327, 407 A.2d 749 (1979); *Committee for Responsible Development on 25th Street v. Mayor of Baltimore,* 137 Md.App. 60, 69, 767 A.2d 906 (2001); *Wankel v. A & B Contractors, Inc.,* 127 Md.App. 128, 171–72, 732 A.2d 333, *cert. denied,* 356 Md. 496, 740 A.2d 614 (1999).

■■■ The doctrine of mootness is not without exceptions, however. Indeed, "on rare occasions, we reach issues that are otherwise moot." *Beeman v. Department of Health & Mental Hygiene,* 105 Md.App. 147, 158, 658 A.2d 1172 (1995); *see J.L. Matthews, Inc. v. Maryland–National Capital Park & Planning Comm'n.,* 368 Md. 71, 96–97, 792 A.2d 288 (2002); *In Re Justin D.,* 357 Md. 431, 444–45, 745 A.2d 408 (2000); *Bond v. Slavin,* 157 Md.App. 340, 354, 851 A.2d 598 (2004).

In *Lloyd v. Bd. of Supervisors of Elections*, 206 Md. 36, 43, 111 A.2d 379 (1954), the Court articulated the standard by which moot cases may be addressed:

[O]nly where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions.... [I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between the government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all of these factors concur with sufficient weight.

The case of *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 775 A.2d 1249 (2001), illuminates the "public interest" exception. That case arose from a domestic violence dispute. The circuit court entered a protective order, which this Court vacated on appeal; we remanded the matter for further consideration of whether the order was appropriate. *Katsenelenbogen v. Katsenelenbogen*, 135 Md.App. 317, 762 A.2d 198 (2000). By the time the case reached the Court of Appeals, it had become moot, because the protective order had expired by its own terms. *Katsenelenbogen*, 365 Md. at 125, 775 A.2d 1249. Nevertheless, the Court of Appeals recognized that the case concerned a matter of public importance that warranted the Court's consideration, despite the mootness. *Id.* In particular, the Court expressed concern that this Court's decision could "be construed as weakening the State's effort to respond aggressively to incidents of violence in the home and frustrating the important objectives of the State's domestic violence law." *Id. See In Re: Justin D.*, 357 Md. at 444–45, 745 A.2d 408.

In our view, the controversy here involves " 'unresolved issues in matters of important public concern that, if decided,

will establish a rule for future conduct'. . . ." *Stevenson v. Lanham*, 127 Md.App. 597, 612, 736 A.2d 363 (1999) (citations omitted). Therefore, we decline to dismiss the case, even assuming it is moot.

## II.

■■■ Appellant contends that the court abused its discretion in denying his motion for reconsideration, "because he is not barred from possessing firearms by any local, state or federal law." [18] Noting that he was merely "the subject of an emergency evaluation petition," and that "there was no diagnosis that [he] was mentally unbalanced or that a commitment was required," appellant argues that "being held for purposes of evaluation . . . is not the equivalent of having been committed."

According to appellant, there is nothing in the federal statute that "indicates an intent to prohibit the possession of firearms by persons who have been hospitalized for observation and examination, where they were found not to be mentally ill." He adds: "Observation is not confinement, it is not treatment, and it does not constitute a mental disorder." Appellant elaborates:

> Mr. Furda was only held for a total of 85 hours, of which 24 hours were in the emergency room just waiting to be transferred to Potomac Ridge, a psychiatric hospital, for purposes of the emergency evaluation. Mr. Furda did have a hearing scheduled, but rather was released within an hour of that scheduled hearing. There was never an adjudication, never a decision made by a Judge, and no evidence was

---

**18.** As discussed earlier, the State agrees with Furda that County law does not apply. Moreover, it does not argues that Furda was prohibited under State law from possessing a regulated firearm. In this regard, P.S. § 5–133(b)(7) is relevant. It prohibits possession of a regulated firearm by persons who have been confined to a mental institution for more than 30 consecutive days. Appellant was not incligible under P.S. § 5–133(b)(7), because he was not confined for more than 30 days. Therefore, we shall focus entirely on whether appellant was committed within the meaning of federal law.

heard. Furthermore, Mr. Furda was not represented by counsel, and he did not have the adversarial proceeding that is clearly contemplated by the Federal statute. . . . Thus, Mr. Furda was never "committed" and was never adjudicated a mental defective, and his brief evaluation period does not disqualify him from possessing firearms.

The State counters that Furda was committed within the meaning of 18 U.S.C. § 922(g)(4), which prohibits possession of a firearm by "a person who has been adjudicated as a mental defective or who has been committed to a mental institution." It rejects appellant's contention that the determination of a "commitment" requires an evidentiary hearing at which the individual is represented by counsel. The State points to several federal cases indicating that, "under statutory schemes similar to Maryland's, an involuntary admission to a mental facility based on doctors' certifications is a 'commitment,' even in the absence of a formal judicial order of commitment following an adversary hearing." Thus, in the context of federal law, the State argues: "Furda was 'committed' at the second stage of Maryland's involuntary admission process—that is, when he was certified for involuntary admission to Potomac Ridge by two doctors at Montgomery General Hospital."

Ordinarily, we review the denial of a motion for reconsideration based on an "abuse of discretion" standard. *Wilson–X v. Dep't of Human Resources,* 403 Md. 667, 674–75, 944 A.2d 509, *cert. denied,* —— U.S. ——, 129 S.Ct. 101, 172 L.Ed.2d 83 (2008). "There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding rules or principles.' " *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110 (1997) (citations omitted). *See also Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 436, 914 A.2d 113 (2007). In *Wilson–X,* 403 Md. at 675–76, 944 A.2d 509, the Court said:

[T]rial judges do not have discretion to apply inappropriate legal standards, even when making decisions that are re-

garded as discretionary in nature. In [*Aventis*] *Pasteur* [*Inc.*] *v. Skevofilax*, 396 Md. 405, 433, 914 A.2d 113, 130 (2007), we confirmed that "a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion." *See also Ehrlich v. Perez*, 394 Md. 691, 708, 908 A.2d 1220, 1230 (2006), citing *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 849 A.2d 451, 459 (2004) and *Alston v. Alston*, 331 Md. 496, 504, 629 A.2d 70, 74 (1993) for the proposition that "even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards." The standard of review remains abuse of discretion. The relevance of an asserted legal error, of substantive law, procedural requirements, or fact-finding unsupported by substantial evidence, lies in whether there has been such an abuse.

We pause to review 18 U.S.C. § 922(g)(4), which provides:

**§ 922. Unlawful acts.**

\* \* \*

(g) It shall be unlawful for any person—

\* \* \*

(4) *who has been adjudicated as a mental defective or who has been committed to a mental institution*

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. . . .

Congress did not define "committed to a mental institution," as it is used in 18 U.S.C. § 922(g)(4). But the legislative history, federal regulations passed pursuant to the statute, and the case law interpreting the statute, provide guidance.

In February 1967, President Lyndon B. Johnson delivered a "message on crime" to the 90th Congress, noting: "Any effective crime control program requires the enactment of firearms legislation." SEN. REP. NO. 1097, (1968), *as reprinted*

*in* 1968 U.S.C.C.A.N. 2112, 2166 (quoting President's Statement on Firearms Control). Urging Congress " 'to place [such legislation] high on its agenda in this session,' " *id.,* the President declared that "to pass strict firearms control laws at every level of government is an act of simple prudence and a measure of civilized society. Further delay is unconscionable." *Id.*

The Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, became law on June 19, 1968. *See* H.R.REP. No. 1577 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4410, 4412. Section 1202(a)(3) of that statute provided that any person who "has been adjudged by a court . . . of being mentally incompetent . . . and who receives, possesses, or transports in commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

One day after the enactment of the Omnibus Crime Control and Safe Streets Act of 1968, H.R. 17735 was introduced at the request of the United States Department of Justice. H.R.REP. No. 1577, (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4412. It was "designed to strengthen the firearms provisions which had been enacted as part of the omnibus crime bill." *Id.* This bill, which eventually became the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213, was signed into law in October 1968.

The House Conference Report, H.R. CONF. REP. No. 90–1956, (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4426, 4429–30, indicated the following:

> Under the House bill sales or other dispositions of firearms or ammunition to the following were prohibited: . . . (4) a person adjudicated in any court as a mental defective or committed under a court order to a mental institution.
>
> *            *            *
>
> Under the Senate amendment no prohibition was placed on sales or other dispositions . . . involving . . . mental defectives, or committed persons.
>
> *            *            *

The conference substitute adopts the broader restrictions provided in the House bill and in the case of mental defectives and committed persons does not require that there be prior action by a court inasmuch as mental boards and commissions constitute the adjudicating or committing authority in some jurisdictions.

The gun laws were "enacted in response to the precipitous rise in political assassinations, riots, and other violent crimes involving firearms, that occurred in this Country in the 1960's." *Lewis v. United States,* 445 U.S. 55, 63, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980). In *Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), the Supreme Court observed that "Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.' " (Citation omitted.)

*Dickerson v. New Banner Inst., Inc.,* 460 U.S. 103, 112 n. 6, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983), is noteworthy as to 18 U.S.C. § 922(g). There, the Supreme Court reiterated: "Congress' intent in enacting § [ ]922(g) . . . was to keep firearms out of the hands of presumptively risky people." The *Dickerson* Court found "particularly instructive" that § 922(g)(4) and (h)(4) impose a "continuing disability" on a person who has been adjudicated a mental defective or committed to a mental institution. *Id.* at 116, 103 S.Ct. 986. It noted that "Congress made no exception for subsequent curative events. The past . . . commitment disqualifies." *Id.*[19] As the Supreme Court explained, "Congress obviously felt that such a person . . . was too much of a risk to be allowed firearms privileges." *Id.*[20]

---

**19.** 18 U.S.C. § 925(c) ameliorates "the harshness of the prohibition against persons who have been 'committed'. . . ." *U.S. v. Holt,* 464 F.3d 101, 103 (1st Cir.2006). It permits the Attorney General to grant relief to a prohibited person under certain circumstances.

**20.** In *United States v. Graves,* 554 F.2d 65, 69 (3d Cir.1977), the court explained: "Title VII [of the Omnibus Act] directly regulates the possession of firearms by the named individuals. Title IV, unlike Title VII, bars false statements by participants in weapons transactions." According to the court, *id.* at 69 n. 10:

In 1997, the Department of the Treasury's Bureau of Alcohol, Tobacco, and Firearms ("ATF") adopted regulations defining the phrases "adjudicated as a mental defective" and "committed to a mental institution," which are not defined in 18 U.S.C. § 922(g)(4). *See* Definitions for the Categories of Persons Prohibited From Receiving Firearms, 62 Fed.Reg. 34,634, 34,637 (June 27, 1997) (to be codified at C.F.R. pt. 178). The ATF explained that it was "amending the regulations to provide definitions for the categories of persons prohibited from receiving or possessing firearms. The definitions will facilitate the implementation of the national instant criminal background check system (NICS) required under the Brady Handgun Violence Prevention Act [which amended parts of the Gun Control Act of 1968]." *Id.* at 34,634.

At the time relevant here, 27 C.F.R. § 478.11 (2003) defined "committed to a mental institution" as follows:

> *Committed to a mental institution. A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.* The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. *The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.* (Emphasis added.)

At the same time, 27 C.F.R. § 478.11 defined "Adjudicated as a mental defective" as follows:

> *Adjudicated as a mental defective.* (a) A determination by a court, board, commission, or other lawful authority that a

---

Title IV consists of 18 U.S.C. §§ 921–28, and 18 U.S.C.App. §§ 1201–03. Originally, Title IV was part of the Omnibus Crime Control and Safe Streets Act of 1968, a comprehensive legislative program with provisions pertaining to *inter alia,* the admissibility of confessions, wiretapping, law enforcement assistance as well as firearms regulations. Title VII was a last minute amendment to the Crime Control Act, intending to bolster the regulatory scheme of Title IV. Together, Titles IV and VII comprise what now is denominated as the Gun Control Act of 1968.

person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:

(1) Is a danger to himself or to others; or

(2) Lacks the mental capacity to contract or manage his own affairs.

(b) The term shall include—

(1) A finding of insanity by a court in a criminal case; and

(2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.

As we see it, whether an individual has been "committed" within the meaning of federal law may, in a particular case, be a mixed question of law and fact. BLACK'S LAW DICTIONARY 1024 (8th ed. 2004) defines "mixed question of law and fact" as follows: "An issue that is neither a pure question of fact nor a pure question of law. . . ." As one legal scholar notes:

[T]here are questions which are purely fact questions (what Mary did yesterday); there are questions that are purely law questions (what does the statute mean); and there are questions that involve the application of law to fact (or mixed questions—was Mary's act a violation of the statute). Those issues which reach the reviewing court tend to be largely in the gray area of mixed law/fact questions.

Martha S. Davis, *A Basic Guide to Standards of Judicial Review*, 33 S.D. L. REV. 469, 474 (1988). *See Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 959 (6th Cir.1976) ("If a determination concerns whether the evidence showed that something occurred or existed, it is a finding of fact. However, if a determination is made by processes of legal reasoning from, or of interpretation of the legal significance of, the evidentiary facts, it is a conclusion of law."), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977). *See also United States v. Endo*, 635 F.2d 321, 323 (4th Cir.1980) (distinguishing adjudicative facts and ultimate facts, which are law mixed with fact, and stating: " 'Ultimate fact questions concern the legal defi-

nitions and effects ascribed to the basic facts . . . . ' ") (Citation omitted).

In this case, in order to determine whether Furda was "committed," the court below had to examine the facts of Furda's 2003 emergency mental evaluation and determine whether those facts constituted a "commitment" under 18 U.S.C. § 922(g)(4). In this regard, we note that there is some disagreement in the courts as to "whether Congress only intended to prohibit gun possession by people whom a state had formally committed to a mental institution, or whether Congress broadly intended to [prohibit] anyone whom a state had placed involuntarily in a mental institution regardless of the patient's opportunity for a hearing . . . ." Clare Priest, *Note: When a Stopgap Measure Triggers a Permanent Proscription: The Interpretation of "Committed to a Mental Institution" in the Gun Control Act of 1968*, 80 WASH. U.L.Q. 359, 361 (2002).

█ Although we have not found any Maryland cases on point with respect to the meaning of the term "commitment," cases from other jurisdictions provide guidance. We agree with the United States Court of Appeals for the Fourth Circuit that the term "commitment" is not limited solely to involuntary civil commitment proceedings. *See United States v. Midgett*, 198 F.3d 143, 146 (4th Cir.1999), *cert. denied*, 529 U.S. 1028, 120 S.Ct. 1440, 146 L.Ed.2d 328 (2000). To the contrary, there are various ways in which one might be deemed to be committed; the substance controls.

█ Nevertheless, in the context of an involuntary, emergency admission to a mental hospital, we are persuaded by the logic of the jurisdictions that have construed "committed" as applying to situations in which, at the very least, the patient has been afforded an evidentiary hearing, held either by a court or a hearing officer; the patient or the defendant has a right to appear and has the right to counsel; and findings are made by the factfinder, based on competent medical evidence. In the absence of such minimal safeguards, the term does not extend to a brief hospitalization for purposes of an emergency

mental health evaluation. Therefore, in this case, Furda's hospitalization was not a commitment under federal law. We explain.

The question of "commitment" under federal law is informed by the law of the particular state. As the Court said in *Midgett*, 198 F.3d at 146, "we must look to the substance of the state procedure." *See, e.g., United States v. Dorsch*, 363 F.3d 784, 785 (8th Cir.2004); *United States v. Giardina*, 861 F.2d 1334, 1335 (5th Cir.1988). Accordingly, we first review Maryland's statutory scheme for involuntary admission of persons, who, as a result of mental illness, may be a danger to themselves or others. We shall consider the version of the statute that was in place in 2003, when Furda was hospitalized.

Maryland Code (2000), Title 10, Subtitle 6 of the Health–General Article ("H.G.") concerns admission provisions to mental health facilities. A "petition for emergency evaluation of an individual may be made ... only if the petitioner has reason to believe that the individual has a mental disorder and that there is clear and imminent danger of the individual's doing bodily harm to the individual or another." H.G. § 10–622(a).[21] A petition for emergency evaluation may be made by various health professionals; a peace officer who has personally observed the individual's behavior; or any other interested person. H.G. § 10–622(b)(1). If the petitioner is not a physician, psychologist, health officer (or designee) or a peace officer, however, the petition must be presented to the court, H.G. § 10–623(a), and may be sustained only if a court finds that there is "probable cause to believe that the emergency evaluee has shown the symptoms of a mental disorder and that there appears to be clear and imminent danger of the emergency evaluee doing bodily harm to the emergency evaluee or another." H.G. § 10–623(b).

---

**21.** H.G. §§ 10–622 and 10–623 were amended, effective October 1, 2003, to provide that the individual must "present[ ] a danger to the life or safety of the individual or of others."

Once a petition for emergency evaluation has been approved by a court or signed and submitted by a peace officer or a qualified health professional, the statute mandates that a peace officer take an "emergency evaluee" to the nearest emergency facility. H.G. § 10–624(a). Within six hours after the "emergency evaluee" is brought to the emergency facility, a physician must evaluate the "emergency evaluee." H.G. § 10–624(b)(2). The "emergency evaluee" must be released unless he or she "asks for voluntary admission" or "meets the requirements for involuntary admission." H.G. § 10–624(b)(3). Under H.G. § 10–624(b)(4), "an emergency evaluee may not be kept at an emergency facility for more than 30 hours."

If an "emergency evaluee meets the requirements for an involuntary admission and is unable or unwilling to agree to a voluntary admission, the examining physician shall take the steps needed for involuntary admission of the emergency evaluee to an appropriate facility. . . ." H.G. § 10–625(a). In particular, an application for involuntary admission of an individual to a facility must be accompanied by the certificates of one physician and one psychologist, or two physicians. H.G. § 10–615(6). Each must sign the certificate, based on an examination of the evaluee. H.G. § 10–616(a). Moreover, it must include a "diagnosis of the mental disorder of the individual"; "an opinion that the individual needs inpatient care or treatment"; "and an opinion that admission to a facility is needed for the protection of the individual or another." *Id.*

Within twelve hours after "initial confinement of an individual to any facility," the individual must be given a form notifying him/her of the provisions under which the individual was admitted, and of the individual's various rights, including the right to an involuntary admission hearing. H.G. §§ 10–631(a)–(b), § 10–632(a). Within ten days of "initial confinement," the individual must be "afforded a hearing to determine whether the individual is to be admitted to a facility . . . as an involuntary patient or released without being admitted."

H.G. § 10–632(a)–(b).[22]   The "hearing officer[23] shall consider all the evidence and testimony of record," H.G. § 10–632(e)(1), and "shall order the release of the individual ... unless the record demonstrates by clear and convincing evidence that at the time of the hearing each of the following elements exist. . . .": "The individual has a mental disorder"; "The individual needs inpatient care or treatment"; "The individual presents a danger to the life or safety of the individual or others"; "The individual is unable or unwilling to be voluntarily admitted ..."; and "There is no available less restrictive form of intervention that is consistent with the welfare and safety of the individual." H.G. § 10–632(e)(2).

The Code of Maryland Regulations ("COMAR") is also applicable.  COMAR distinguishes between "observation status" and "involuntary admission."   Specifically, COMAR 10.21.01.02(18) defines "observation status" as

> the status of an individual between the time the individual is initially confined in an inpatient facility on the basis of application and certificates for IVA [involuntary admission] and the time the individual is either admitted, voluntarily or involuntarily, to the inpatient facility or is released by a physician or by an ALJ [administrative law judge] from the inpatient facility without being admitted.

COMAR 10.21.01.02(12) defines "involuntary admission" as follows: "[When] an individual has been admitted to an inpatient facility by an ALJ *following an IVA hearing pursuant to Health–General Article, § 10–632, Annotated Code of Maryland.*" (Emphasis added).

The Maryland statutory scheme seems consistent with 27 C.F.R. § 478.11. It contemplates an involuntary commitment

---

**22.** The hearing may be postponed for good cause for no more than seven days.  H.G. § 10–632(c)(1).

**23.** COMAR 10.21.01.09 requires an "involuntary admission" hearing to be conducted by an administrative law judge of the Office of Administrative Hearings.

of an individual only if, *inter alia,* there is an evidentiary hearing.

*United States v. Midgett, supra,* 198 F.3d 143, is instructive, because it stands in marked contrast to what transpired in this case. There, the defendant was charged in a Virginia state court with breaking and entering. *Id.* at 144. Because he "appeared to be suffering from mental problems, the [Virginia state] court appointed a physician" to evaluate him "to determine his mental competence to stand trial and his sanity at the time of the offense." *Id.* The physician concluded that Midgett was "suffering from a Delusional Disorder or even a Paranoid Schizophrenic formulation. . . . Therefore, he is in definite need of treatment which would require his hospitalization in a Psychiatric facility. . . ." *Id.* The trial court reviewed the physician's statement, heard evidence, and then made factual findings. *Id.* "Based upon these findings, and with the consent of both Midgett's attorney and the attorney for the Commonwealth," the court issued an order committing the defendant "to the custody of the Central State Hospital for mental health treatment under Va.Code Ann. § 19.2–169.2 (Michie 1995)." *Id.* at 144–45. As a result, Midgett was hospitalized for two months. *Id.* at 145. The prosecutor nol prossed the state charges, and Midgett was released for outpatient care on January 22, 1997. *Id.*

A few years later, numerous weapons were found in Midgett's home. *Id.* He was indicted in federal court on four counts of possession of a firearm by a person who had been committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4). *Id.* Midgett moved unsuccessfully to dismiss the indictment, arguing that "his admission . . . pursuant to the [earlier] state court order was not a 'commitment' under section 922(g)(4). . . ." *Id.*

On appeal, Midgett reiterated that his confinement did not constitute a commitment, asserting that the federal statute applies only to confinements "resulting from the state's formal civil commitment process." *Id.* The Fourth Circuit disagreed, concluding that "the statute has a broader application." *Id.* It

explained: "In interpreting section 922(g)(4) . . . we are not bound by the terminology of Virginia statutory law; rather, we must look to the substance of the state procedure. . . . And when we do, we cannot help but conclude that Midgett's confinement was a commitment within the meaning of the statute." *Id.* at 146.

In the Fourth Circuit's view, Midgett's confinement "falls squarely within any reasonable definition of 'committed' as used in Section 922(g)(4)." *Id.* The court cited the following facts in support of its decision, *id.*:

(1) Midgett was examined by a competent mental health practitioner; (2) he was represented by counsel; (3) factual findings were made by a judge who heard evidence; (4) a conclusion was reached by the judge that Midgett suffered from a mental illness to such a degree that he was in need of inpatient hospital care; (5) a judicial order was issued committing Midgett to a mental institution; and (6) he was actually confined there.

The Fourth Circuit reasoned, *id.*: "Given Midgett's proven history of mental instability, he is undoubtedly in that class of persons 'who by reason of their status, Congress considered too dangerous to possess guns.' *United States v. Dunford,* 148 F.3d 385, 388–89 (4th Cir.1998)." It concluded, *id.*: "Under these particular circumstances, we have no hesitancy in finding that Midgett was committed to a mental institution and that application of section 922(g)(4) is proper." *Id.*

Unlike in *Midgett,* appellant was not afforded an opportunity for an attorney during his brief confinement; no hearing was ever held, either by a court or a hearing officer; no factual findings were made by a judge or a hearing officer who heard evidence; and no judicial or administrative order was issued to detain appellant.

*United States v. Hansel,* 474 F.2d 1120 (8th Cir.1973), is also informative. There, a local board of mental health concluded that the defendant was mentally ill and ordered him to be hospitalized pursuant to a Nebraska statute. *Id.* at 1122. A doctor evaluated the defendant, found that he did not have a

serious mental disorder, and that he did not need hospitalization. *Id.* Hansel subsequently purchased a firearm and, in doing so, "stated on the 'Firearms Transaction Record' that he had not been adjudicated mentally defective or committed to a mental institution." *Id.* at 1121. Thereafter, he was charged with a violation of 18 U.S.C. § 922(a)(6), for falsely certifying that he had not been adjudicated a mental defective or committed to a mental institution. *Id.* He was also charged with violating 18 U.S.C. § 922(h)(4) (now g(4)), for receipt of a firearm after having been adjudicated a mental defective or committed to a mental institution. *Id.* After Hansel was convicted, he appealed. *Id.* The Eighth Circuit reversed both convictions. *Id.* at 1125.

In finding that the defendant had not been "committed" within the meaning of 18 U.S.C. § 922(h), the Eighth Circuit noted that nothing in the statute "indicates an intent to prohibit the possession of firearms by persons who had been hospitalized for observation and examination, where they were found not to be mentally ill." *Id.* at 1123. It added: "The statute makes it clear that a commitment is required." *Id.*

*United States v. Giardina,* 861 F.2d 1334 (5th Cir.1988), is also noteworthy. There, the defendant was examined by a staff psychiatrist at a Louisiana health clinic. *Id.* at 1334. After the psychiatrist signed a Physician's Emergency Certificate, the police took Giardina to a local hospital, where a deputy coroner executed a Coroner's Emergency Certificate, by which the defendant was detained for treatment for two weeks. *Id.* He was then released without any additional hospitalization or legal proceedings. *Id.* Giardina was later indicted for "receiving and possessing a firearm after having been committed to a mental institution...." *Id.* at 1334–35. After the district court ruled that Giardina had been committed to a mental institution, Giardina appealed. *Id.* at 1335.

The Fifth Circuit observed that "whether Giardina was committed to a mental institution is a question of federal law, but in making that determination we may seek guidance from state law." *Id.* at 1335. It posited: "Was Giardina committed

under Louisiana law? If he was not, is that answer consistent with federal policy?" *Id.* The court concluded that Giardina's brief, emergency evaluation did not "constitute a commitment under Louisiana law. *Id.* at 1337. Therefore, unless this conclusion is inconsistent with federal policy, there has been no violation of Title 18 U.S.C. § 922(g) by Giardina." *Id.* at 1336. The court agreed with the *Hansel* Court that there is no indication in the statute that Congress intended to prohibit persons who had been hospitalized for observation and examination from possessing firearms. *Id.* at 1337 (citation omitted).

*United States v. Dorsch,* 363 F.3d 784 (8th Cir.2004), also provides guidance. Dorsch was convicted of violating 18 U.S.C. § 922(g)(4) after more than thirty firearms were found in his residence and it was learned that he previously had been involuntarily "committed" to the South Dakota Human Services Center. *Id.* at 785. Dorsch argued that his admission did not constitute a commitment to a mental institution under § 922(g)(4). *Id.* The trial court disagreed. *Id.*

On appeal, Dorsch renewed his contention. *Id.* Citing 27 C.F.R. § 478.11, the appellate court noted that "regulations promulgated under § 922 define 'committed to a mental institution' as '[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.'" *Id.* (citation omitted). In construing 18 U.S.C. § 922(g)(4) under federal law, the court sought "guidance from the law of the state where the prior commitment occurred [South Dakota] as to the meaning of commitment." *Id.* The court observed: "The regulations further specify that involuntary commitments are included within the definition, but persons in a mental institution for observation or on a voluntary basis are not within the purview of the statute." *Id.*

The court rejected Dorsch's claim that he had not been "committed to a mental institution as contemplated by Title 18 U.S.C. § 922(g)(4) and 27 C.F.R. § 478.11." *Id.* at 786–87. In reaching that conclusion, the court noted that the County Board of Mental Illness found that Dorsch was mentally ill

and that "involuntary commitment to a mental facility was the least restrictive treatment available for him." *Id.* at 786. Moreover, it noted that these determinations "followed a hearing, during which Dorsch was represented by counsel, was given the opportunity to present evidence and cross-examine witnesses, and during which a physician testified that Dorsch was mentally ill and met the requirements of the statute." *Id. See also United States v. Whiton*, 48 F.3d 356, 358 (8th Cir.1995) (stating that defendant was "committed" for purposes of § 922(g)(4) where, following a hearing, a state court judge found defendant to be mentally ill and orally ordered him "committed" to the hospital for temporary mental health services).

In *Gallegos v. Dunning*, 277 Neb. 611, 764 N.W.2d 105 (2009), Gallegos voluntarily sought treatment at a hospital in Nebraska. *Id.* at 107. After the doctor examined him, she filed a petition with a mental health board ("MHB"), averring that she believed Gallegos was mentally ill and asking for a " 'hearing to determine whether [Gallegos] is a mentally ill dangerous person.' " *Id.* (alterations in original). That same day, the MHB appointed another physician, Dr. William Marcil, as Gallegos's custodian, " 'with the understanding that [Gallegos] is to be held in [Marcil's] custody . . . for care and treatment up to a period of 7 days from the date of this order.' " *Id.* (alterations in original). A hearing was to be held three days later. *Id.* On the day of the hearing, Gallegos filed a request with the MHB for a 90–day continuance so that he could complete inpatient treatment at a local hospital. *Id.* Gallegos agreed that if he failed to " 'fully comply with [his] treatment plan, the County Attorney may pursue civil commitment against [him].' " *Id.* (alternation in original). The MHB granted the request and the petition was " 'continued for 90 days on recommendation of . . . Marcil . . . for reason the subject agrees to treatment at the mental hygiene clinic and [posttraumatic stress disorder] Clinic.' " *Id.* (alteration in original). On January 16, 2002, the initial petition was dismissed. *Id.*

In February 2007, Gallegos filed a federal firearms application with the sheriff, who "refused to issue Gallegos a gun registration," because Gallegos's " '[MHB] Order with hospital stay' was a 'Federal Handgun Prohibitor.' " *Id.* at 108 (alteration in original). The county court affirmed. *Id.* On appeal to the Supreme Court of Nebraska, the court acknowledged that whether Gallegos had been committed to a mental institution under 18 U.S.C. § 922(g)(4) is determined under federal law, *id.*, but recognized that it "may . . . seek guidance from Nebraska law as to the meaning of 'commitment.' " *Id.* at 108–09. The court said, *id.* at 109:

> Under the version of the Nebraska Mental Health Commitment Act (MHCA)[ ] in effect at the time of Gallegos' hospitalization, any person who believed another might be mentally ill and dangerous could communicate that belief to the county attorney.[ ] If the county attorney agreed, he or she could file a petition with the local board of mental health stating such belief and indicating whether the subject of the petition should be immediately taken into custody.[ ]

> Assuming it was necessary to take someone into immediate custody, a warrant would be issued for that purpose.[ ] Under this circumstance, Nebraska law required the subject to be examined by a mental health professional within 36 hours unless the subject had been examined within the previous 24 hours. A hearing was required

>> to determine whether there [was] clear and convincing proof that the subject of a petition [was] a mentally ill dangerous person and that neither voluntary hospitalization nor other alternatives less restrictive of his or her liberty than a mental-health-board-ordered treatment disposition [were] available or would suffice to prevent the harm described in Section 83–1009 [a substantial risk of harm to the subject or to others].[ ]

Further, the court explained that, after the MHB conducted a hearing, it "could either conclude there was not clear and convincing evidence that a subject was a mentally ill dangerous person, and dismiss the petition,[ ] or could conclude there was clear and convincing evidence that the subject was a

mentally ill dangerous person." *Id.* If the MHB found that " 'neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty [were] available,' the board was required to enter an order providing for treatment of the subject." *Id.* (alterations in original)

The court determined that Gallegos was not committed within the definition set forth in 27 C.F.R. § 478.11 or within the meaning of 18 U.S.C. § 922(g)(4). *Id.* at 110. It reasoned: "While Gallegos was initially hospitalized under an MHB order, the MHB never made any finding that Gallegos was a mentally ill dangerous person." *Id.* Moreover, the MHB never found that " 'voluntary hospitalization [or] other alternatives less restrictive of his ... liberty than a mental-health-board-ordered treatment disposition' were necessary." *Id.* Rather, the board "granted Gallegos' request that he be allowed to undergo voluntary treatment and eventually dismissed the petition filed against him." *Id.*

The Court was also of the view that its finding was consistent with the definition of "committed to a mental institution" in 27 C.F.R. § 478.11, which requires a "formal" commitment and excludes admission to a mental institution " 'for observation.' " *Id.* The Court said, *id.:* "To the extent that Gallegos' 3–day hospitalization prior to his request to undergo voluntary hospitalization could be considered a 'commitment,' such was also unaccompanied by any hearing or finding that Gallegos was a mentally ill dangerous person."

In *United States v. Waters,* 23 F.3d 29 (2nd Cir.1994), the defendant was involuntarily hospitalized in 1979 "on a Two–Physicians Certificate, in accordance with New York Mental Hygiene Law § 9.27(a)." *Id.* at 30. The court noted that, pursuant to New York law, "The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person." *Id.* The court also noted that an individual involuntarily admitted under New York law "may request a hearing on the question

of the need for involuntary care and treatment 'at any time prior to the expiration of sixty days from the date of involuntary admission of [the] patient.' " *Id.* (citation omitted). Waters never requested or had a hearing. *Id.* In fact, sixty days following his involuntary admission, he "requested that his status be converted to voluntary status ...," and he was released seven months later. *Id.*

In November 1991, Waters was indicted for a violation of 18 U.S.C. § 922(g)(4), based on his psychiatric hospitalization in 1979. *Id.* at 29–30. He moved to dismiss the indictment, arguing that his earlier hospitalization "did not constitute a 'commitment' to a mental institution" within the meaning of the federal statute, "because there was no judicial order of commitment." *Id.* at 30. The district court denied the motion. *Id.*

On appeal, the court noted that, "[w]hile determination of the issue of whether the appellant 'was committed to a mental institution is a question of federal law,' a reviewing court may 'seek guidance from state law.' " *Id.* at 31 (citation omitted). It explained that "[o]nce state law has addressed the general question, the federal court must then consider if the outcome is consistent with federal policy." *Id.* The court concluded that, under New York law, the right to a formal judicial proceeding was never triggered because the patient converted his hospitalization to a voluntary admission of prolonged duration. *Id.* at 34. Thus, the court was satisfied that the hospitalization amounted to a commitment. *Id.* at 36.

Here, Mr. Furda arrived at the Hospital at 2:28 a.m. on February 28, 2003, and he was evaluated in the emergency room. Appellant was transferred to Potomac Ridge within 24 hours. Although a hearing was set for March 4, 2003, at 9:30 a.m., to determine whether appellant would be released or detained involuntarily, the record does not reflect that a hearing ever took place. Notably, Furda was not afforded an attorney, and no court, agency, or hearing officer made findings of fact or conclusions of law to establish grounds to detain appellant involuntarily. Indeed, Furda was discharged from

Potomac Ridge within an hour of the hearing scheduled on March 4, 2003. Dr. Marnell made the following assessment:

I have no grounds for detaining the patient at this time. There is no evidence of psychosis, confusion or withdrawal. He denies being suicidal or homicidal. He is behaviorally appropriate on the unit. His mood has stabilized. He is responsible for his actions. . . . Once again, I emphasize the patient is completely responsible for his actions.

The State relies on *United States v. Chamberlain,* 159 F.3d 656 (1st Cir.1998). There, a health clinician sought Chamberlain's involuntary admission to a mental institution on an emergency basis. *Id.* at 657. In the application, the clinician indicated that " 'Chamberlain has a mental illness and, due to mental illness, poses a likelihood of serious harm, on the basis that he put a loaded gun to his head and threatened his wife.' " *Id.* A judge in Maine certified that the application complied with the law, and ordered the subject's admission to a mental institution for no more than five days, the maximum length of an emergency detention under Maine statutory law. *Id.* After the initial five-day emergency detention, Chamberlain voluntarily admitted himself to the facility and remained there for a little over a week. *Id.*

Chamberlain was later arrested for possessing firearms, in violation of 18 U.S.C. § 922(g)(4). *Id.* He moved to dismiss the charge, arguing that he had not been "committed to a mental institution" within the meaning of the statute. *Id.* Reasoning that " 'commitment' occurs pursuant to procedures required by state law," *id.* at 658, the court said: "[W]e believe that the proper interpretation of the phrase, 'committed to a mental institution' should not turn primarily on the label attached by the state legislature to its procedures, but rather on the substance of those procedures." *Id.* at 663. It continued: "Thus, rather than focus on the nuances of state statutory language in interpreting 'commitment,' we look at the realities of the state procedures and construe them in light of the purposes Congress sought to accomplish by prohibiting firearm possession by someone who has been 'committed to a mental institution.' " *Id.* The court focused on determining

"whether identifying the state's procedures for involuntary hospitalization as a 'commitment' is reasonable and consistent with the federal policy underlying the firearms ban—namely, to keep firearms out of the hands of those who, if permitted to possess them, would pose a risk or potential for harm." *Id.*

In concluding that Chamberlain was "committed" to a mental institution for the purpose of the federal statute, the court stated, *id.* at 664:

> We reject Chamberlain's argument that a person is not "committed" for purposes of the federal firearms ban unless all of the requirements set forth in section 3864 [of the Maine statute] including provision of counsel, a full-blown adversary hearing, a finding by clear and convincing evidence that the person suffers from a mental illness, and a judicial order of commitment—are satisfied.... [T]o treat section 3864 detention as the only "real" commitment would come close to limiting "commitments" to cases in which a person has actually been "adjudicated a mental defective" after an adversary hearing. [The statute] separately bans persons who have been "adjudicated a mental defective" from owning firearms, in addition to those who have been "committed to a mental institution." ... *Requiring an adversary hearing and a judicial finding of mental illness would conflate two of the categories Congress singled out for the firearms prohibition.* (Emphasis added.)

The State also cites *United States v. Holt,* 464 F.3d 101 (1st Cir.2006), which is consistent with *Chamberlain.* There, on February 16, 2004, a licensed clinical social worker applied for Holt's involuntary admission to a mental institution in Maine. *Id.* at 102. The application included a certification from a psychiatrist who examined Holt and concluded that he posed a " 'likelihood of serious harm due to a mental illness....' " *Id.* The next day, a state judge authorized the county sheriffs to move Holt to a medical facility. *Id.* By May 10, 2004, Holt was no longer in a medical facility. *Id.*[24]

---

24. The record does not reveal the exact duration of Holt's admission.

Holt was subsequently charged with violating 18 U.S.C. § 922(g)(4), by possessing a firearm after having been committed to a mental institution. *Id.* At trial, over objection, the court instructed the jury that " '[a]n involuntary commitment occurs when a State Judge, pursuant to an application for involuntary admission to a mental hospital, authorizes the sheriff to take the person into custody and transport him to a hospital.' " *Id.* at 103. Holt was convicted and appealed. *Id.*

On appeal, the court decided the "commitment" issue by considering the Maine involuntary commitment statute, which is similar to Maryland's. In that statute, upon application, and with a proper medical certificate, a judicial officer reviews the material and, if the judicial officer is satisfied that the documents are in accordance with law, he or she shall "endorse" them. *Id.* at 104. At that point, the subject may be transported to a hospital. *Id.* The court relied on *Chamberlain* in concluding that "a commitment under the Maine statute occurs when the court orders an involuntary hospitalization and not when the . . . physician determines that the individual should remain in the institution after the 24–hour examination. . . ." *Id.* at 106. In the court's view, the judicial order authorizing Holt's admission met "the ordinary definition of 'commitment' embraced in *Chamberlain*: 'to place in or send officially to confinement . . . to consign legally to a mental institution. . . .' " *Id.* at 105 (quoting *Chamberlain*, 159 F.3d at 661) (quoting Webster's Third New Int'l Dictionary (1971)).

The First Circuit reasoned that "the term 'committed' in the statute refers to a judicial (or possibly an administrative) order of commitment and does not depend on the ultimate outcome of the commitment." *Id.* Because a court had initially ordered Holt's involuntary hospitalization, the court rejected his argument that he was not "committed" under the federal statute. *Id.*

In our view, Congress generally intended for the "commitment" process to be marked by some type of adjudicatory process. The ATF regulations, set forth in 27 C.F.R.

§ 478.11, are consistent with that interpretation.[25] Similarly, the substance of Maryland's statutory and regulatory scheme, discussed *supra,* clearly recognizes that an emergency evaluation is not the same as a "commitment." It affords individuals the procedural protections that are harmonious with what we believe Congress intended.

We are not persuaded by the view that if an evidentiary hearing is required in order for an admission to constitute a commitment, then it would conflate and render meaningless the statutory alternative of "adjudicated a mental defective." The breadth of the C.F.R.'s definition of "adjudicated as a mental defective" convinces us that the two concepts are not the same, so as to render one superfluous, which would be at odds with principles of statutory construction. *See, e.g., Lockshin v. Semsker,* 412 Md. 257, 274–75, 987 A.2d 18 (2010). Moreover, as in *Waters, supra,* 23 F.3d 29, we recognize that there may well be circumstances when the need for a hearing is not triggered, such as when a patient agrees to a voluntary admission. As the *Midgett* Court indicated, 198 F.3d at 146, a person can be found to have been committed outside the parameters of the civil commitment process, because it is the substance of what occurred that is dispositive. But, in this case, we see no substance that would lead us to conclude that appellant was committed.

Finally, we disagree with the view expressed in *Chamberlain,* suggesting that the initial, *ex parte* judicial review of a petition is sufficient to constitute a commitment. That a judge approves an ex parte petition for an emergency,

---

**25.** As noted, the C.F.R. defined "committed to a mental institution" as follows:

A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. *The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.* (Emphasis added.)

involuntary mental health evaluation is hardly the equivalent of a commitment. In our view, that would be akin to suggesting that an arrest warrant approved by a judge is the equivalent of a conviction.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY MONTGOMERY COUNTY.