REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2319

SEPTEMBER TERM, 2014

KIM L. SYDNOR, *et al.*

v.

ALVIN C. HATHAWAY, *et al.*

Eyler, Deborah, S.,
Meredith,
Wilner, Alan M.
(Retired, Specially Assigned),

JJ.

Opinion by Eyler, Deborah, S., J.

Filed: July 27, 2016

Melanie M. Shaw Geter, J., did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8-605.1.

This appeal is the culmination of a decade's long dispute between the Union Baptist Development Corporation ("the Corporation") and the Union Baptist Church of Baltimore, Inc. ("the Church") over real property situated at 1201 Druid Hill Avenue, in Baltimore City ("the Property"). The Property is part of the land on which a large Head Start Center building (the "Head Start Center") is located. The Head Start Center also covers 1203, 1205, 1207, and 1209 Druid Hill Avenue and 408 Dolphin Street. The appellants are Kim Sydnor, the most recent past President of the board of directors of the Corporation, which had forfeited its charter, and Joseph Howard and Sandra Dobson, members of that board (the "Corporation Parties"). The appellees are the Church, Alvin Hathaway, its senior pastor, and Samuel Billups, a parishioner (the "Church Parties").

In the Circuit Court for Baltimore City, the Corporation Parties sued the Church Parties for declaratory and injunctive relief.[1] After a bench trial, the court entered a judgment declaring that the Corporation is the sole owner of the Property; the Corporation's charter was forfeited and its revival was ineffective; a transfer of the Property from the Corporation to the Church by quitclaim deed was ineffective; and a later dissolution of the Corporation also was ineffective. The court went on to order, however, "as a matter of equity pursuant to [Md. Code (1975, 2014 Repl. Vol.), section 5-209 of the Corporations and Associations Article ('CA')]," that the Property be

---

[1] Reverend Hathaway and Billups were the original defendants. Later, the court allowed the Church to intervene as a defendant.

transferred to the Church.[2]  To accomplish the transfer of the Property, the Court ratified

the quitclaim deed, declaring it effective at the time of the judgment.  Finally, the court

declared that the Corporation was dissolved.

More than ten days after the judgment was entered, the Corporation Parties filed a

motion to alter or amend, under Rule 2-534, which the court treated as a motion for

reconsideration, under Rule 2-535.[3]  The Corporation Parties also filed a Rule 1-341

motion for sanctions.  The Corporation Parties filed a notice of appeal within 30 days of

the entries of orders denying those motions, but not within 30 days of the entry of the

declaratory judgment.

For the following reasons, we shall affirm the judgment of the circuit court in part

and reverse it in part.  Specifically, we shall affirm the judgment transferring the Property

from the Corporation to the Church; affirm the judgment denying attorneys' fees; and

reverse the judgment dissolving the Corporation.

## FACTS AND PROCEEDINGS

The Church, founded in 1852, is located at 1219 Druid Hill Avenue, in the Upton

neighborhood of West Baltimore. In 1978, Vernon N. Dobson, the senior pastor,

announced as a vision for the Church a ministry to revitalize the immediate

---

[2] Unless otherwise specified, all statutory references in this opinion are to the Corporations and Associations Article.

[3] The declaratory judgment was entered on the docket on Monday, September 29, 2014. Thursday, October 9, 2014, was the deadline for filing a timely ten-day post-judgment motion. The Corporation Parties filed their motion on Tuesday, October 14, 2014, as reflected by the "Received" stamp placed on the motion that day.

2

neighborhood, which was impoverished, to help the people in it. The first project of that ministry was a coffee house to serve the needs of the elderly in the community. Reverend Dobson obtained a commitment from the City of Baltimore ("the City") for a grant to fund the project.

The Church contracted to purchase the Property, a dilapidated row house on the northwest corner of Druid Hill Avenue and Dolphin Street, to rehabilitate it for use as a coffee house. The grant from the City covered the purchase price and closing costs for the Property and the cost to renovate it. Because the Church is a religious organization, the City would not pay the grant money directly to it. Reverend Dobson formed the Corporation to receive the grant money from the City and to take title to the Property. The deed conveying the Property to the Corporation was recorded in the Land Records for Baltimore City ("Land Records") on April 3, 1981.

At the Corporation's inception and for almost 30 years thereafter, Reverend Dobson served as chairman of the board of directors. At a board meeting on April 9, 1981, he gave his "perspective" on the relationship between the Church and the Corporation. Speaking in reference to the planned coffee house, he explained that "the entire corporation is an extension of the church and that anything which is done should be done from that standpoint." The minutes of that meeting reflect that the board members agreed with "this philosophy."

The Corporation was registered with the Maryland State Department of Assessments and Taxation ("SDAT") as a nonstock corporation. Section THIRD of its Articles of Incorporation lists as its purposes:

a. to stabilize and restore the 1200 Block of Druid Hill Avenue and the surrounding neighborhood by purchasing and rehabilitating residential units[;]

b. to purchase and develop the property known as 1201 Druid Hill Avenue [the Property], and create therein a coffee house which will provide a daylight haven for the elderly in the neighborhood[; and]

c. to engage in any and all other acts, ventures and/or businesses which are lawful under the law of Maryland so long as the same are not engaged in for purposes of individual profit.

Section NINTH, paragraph 3 states the Corporation "shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code . . . or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code[.]" Paragraph 4 of that section states that upon dissolution of the Corporation,

> the Board of Directors shall, after paying or making provision for the payment of all the liabilities of the corporation, dispose of all of the assets of the corporation exclusively for the purposes of the corporation in such manner, or to such organization or organizations organized and operated exclusively for charitable, religious purposes as shall at the time qualify as an exempt organization or organization under Section 501(c)(3) of the Internal Revenue Code . . . as the Board of Directors shall determine. Any of such assets not disposed of shall be disposed by the Circuit Court of Baltimore City or such other courts sitting in equity in the political subdivision in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized or operated exclusively for such purposes.[4]

---

[4] The Articles of Incorporation were first submitted to the State Department of Assessments and Taxation ("SDAT") in 1980, but were rejected, because the name the Corporation was using—Union Development Corporation—was too similar to a name already registered to another corporation. At its April 9, 1981 meeting, the board voted

(Continued…)

4

Reverend Dobson and several parishioners who served on the Corporation's board worked closely with the Church. The Property was rehabilitated as planned and was operated as a coffee house frequented by the elderly in the community. Around this time, the Church acquired property located at 408 Dolphin Street, which was behind the Property, and operated it as a laundromat.

On dates in the late 1980s and early 1990s, the owners of 1203, 1205, 1207, and 1209 Druid Hill Avenue, all dilapidated properties, donated them to the Church. These properties, comprising all the lots between the Church and the Property, and the 408 Dolphin Street property, surrounded the Property ("the Surrounding Properties"). In 1992, at a function celebrating the Church's 140th anniversary, Reverend Dobson announced a new Church ministry to raze the rehabilitated row house on the Property and the structures on the Surrounding Properties and in their place erect a Head Start Center to house a community Head Start Program, facilities for other programs that would advance other of the Church's ministries, and a new coffee house.

The Church obtained a $1 million grant from the State to build the Head Start Center, conditioned on its matching the State's funding. The Church launched the "Child First Campaign" to secure the matching funds. It raised over $400,000 from members of the congregation and the community and obtained a $600,000 loan from a local bank,

---

(…continued)
to change the name of the Corporation to Union Baptist Development Corporation. Articles of Incorporation in that name were accepted by the SDAT on June 1, 1981.

guaranteed by the State. The State distributed the grant money directly to the Church. The Corporation played no role in raising money for the Head Start Center or in its planning or construction. The Head Start Center opened in November 1995. The Head Start Program began operation shortly thereafter. That program always has been operated under the auspices of the Church, and the Union Baptist Church School, Inc., continues to operate it today.

As these facts reveal, the Head Start Center, a large, indivisible structure, was built on the ground of the Property, owned by the Corporation, *and* on the grounds of the Surrounding Properties, all owned by the Church. The Corporation could have sought and obtained tax-exempt status under the Internal Revenue Code and state law, but it never did so. Consequently, it was required to pay property taxes on the Property. In 1994, before the Head Start Center was completed, the Corporation asked the City to consolidate the Property with the Surrounding Properties, under the address 1201 Druid Hill Avenue, for the purpose of receiving a single property tax bill. The request was denied on several grounds, including that there was not a single owner. However, on March 21, 1995, the consolidation request was granted and forwarded to the SDAT. The SDAT real property record for 1201 Druid Hill Avenue was changed to show that it covered .29 acres, which is all the ground for the 1201, 1203, 1207, and 1209 addresses, and the 408 Dolphin Street address. The mailing address was listed as 1219 Druid Hill Avenue, which, as noted, is the Church's address.

It appears that, until 2004, the Church, not the Corporation, paid the property taxes for the Property. That year, the Church fell on hard times financially and was not able to

6

pay the property taxes. The City sold the Property at tax sale. Because the Property's address—1201 Druid Hill Avenue—had been reassigned to it *and* the Surrounding Properties, the entire Head Start Center became the subject of the tax sale, even though most of it was on property owned by the Church, which is tax exempt.

The tax sale purchasers sued in the Circuit Court for Baltimore City to foreclose the Corporation's right of redemption, and the Corporation paid $12,000, plus $6,000 in attorneys' fees, to redeem its right in the Property. Counsel for the tax sale purchasers drafted a re-conveyance deed for the Property to the Corporation. At that point, the Church intervened, filing a motion to quiet title and claiming ownership of all of 1201 Druid Hill Avenue, including the Property. In a final declaratory judgment entered in late 2007, the circuit court ruled that the Corporation owned the Property, *i.e.*, the original 1201 Druid Hill Avenue lot, and the Church owned the Surrounding Properties.[5] For reasons not reflected in the record, the Corporation did not record the deed re-conveying the Property from the tax sale purchasers to it until 2011.

By the time the tax sale case was decided, the days of the Corporation and the Church working in tandem were over. Reverend Dobson, in ill health, resigned as senior pastor of the Church in early 2007 and was replaced by Reverend Hathaway. On October 31, 2007, the board of trustees of the Church, chaired by Reverend Hathaway, voted to establish an "alternate" board of directors for the Corporation, with Reverend Hathaway as President and Mr. Billups as Treasurer.

---

[5] That decision was affirmed on appeal by this Court.

On December 7, 2007, the Corporation brought an ejectment action in an effort to remove the Church from the Head Start Center. The suit was dismissed, with prejudice, and sanctions were imposed against the Corporation's board members and attorneys. Then, in 2009, the Church brought suit for declaratory and injunctive relief, seeking to remove the members of the Corporation's board of directors and replace them with Church parishioners. The case was dismissed without prejudice and no further action was taken on it.

The Corporation had a long history of having its charter forfeited for failure to file personal property tax returns. In fact, in the 35 years since its formation, the Corporation's charter has been forfeited for more than 25 years, off and on.[6] The last forfeiture was on October 1, 2012. On March 1, 2013, the "alternate" board of directors filed on the Corporation's behalf a 2011 personal property tax return and articles of

---

[6] The chronology is as follows:

| | |
|---|---|
| 06/01/1981 through 10/16/1984: | Registered with SDAT; good standing |
| 10/17/1984 through 08/06/1994: | Charter forfeited |
| 08/07/1994 through 10/03/1996: | Charter revived by the appellants; good standing |
| 10/04/1996 through 03/15/2005: | Charter forfeited |
| 03/16/2005 through 09/30/2012: | Charter revived by the appellants; good standing |
| 10/01/2012 through 02/28/2013: | Charter forfeited |

revival, which the SDAT accepted without inquiry. Then, on March 20, 2013, Reverend Hathaway, purporting to act as President of the Corporation, executed a quitclaim deed, transferring title of the Property from the Corporation to the Church. The Corporation Parties had no knowledge of this transfer when it happened and only discovered it when they sought to revive the Corporation's charter.

On July 30, 2013, the Corporation Parties filed the action that underlies this appeal. Soon thereafter, on August 22, 2013, Reverend Hathaway and Mr. Billups, on behalf of the "alternate" board, filed articles of dissolution for the Corporation. On January 30, 2014, they filed an answer to the complaint. Thereafter, the Church was permitted to intervene as a defendant.

In an amended complaint, the Corporation Parties alleged that Reverend Hathaway and Mr. Billups were not members of the board of directors of the Corporation and they and the "alternate" board had no capacity or authority to act on the Corporation's behalf. Consequently, the acts they took on behalf of the Corporation were void as a matter of law. The Corporation Parties asked the court to declare the Corporation's revival a nullity, to void the quitclaim deed transferring the Property from the Corporation to the Church, and to void the dissolution of the Corporation.

A three-day bench trial commenced on September 10, 2014. In the Corporation Parties' case, Ms. Sydnor testified that she became a member of the Corporation's board of directors in 2005 and that, when the articles of revival were filed by the "alternate" board on March 1, 2013, she was the most recent past President of the Corporation. Although acknowledging that the court in the 2007 tax sale case had found otherwise, she

9

testified that she thought the Property and the Surrounding Properties had been "consolidated" under the Corporation's ownership. Ms. Dobson, also a member of the Corporation's board of directors, testified as well that she thought the Property and the Surrounding Properties had been "consolidated" under the Corporation's ownership. She agreed that the Church should continue to operate the Head Start Program in the Head Start Center. According to Ms. Dobson, the Corporation's only asset is the Property; the Corporation never has had more than $2,000 in its bank account; and it does not operate any programs. Counsel for the Corporation Parties conceded that the Corporation did not have any liabilities.

In their case, the Church Parties called the lawyer for the 2004 tax sale purchasers; an expert witness in the area of conveyances of title and real property in Maryland; Evelyn Chatmon; and Reverend Hathaway. The tax sale attorney testified that at the time of the tax sale, the Land Records and the SDAT records did not show that the Property was consolidated with any other properties for any purpose. The expert witness opined that it was unlikely that ownership of the Property and the Surrounding Properties ever could have been consolidated because consolidation requires a common owner and, in the instant case, the Corporation owned the Property and the Church owned the Surrounding Properties. He also opined that the Corporation and the Church were tenant in common owners of the Head Start Center building itself, with the Corporation holding a one-fifth ownership interest and the Church holding a four-fifth ownership interest.

Ms. Chatmon, a member of the Corporation's original board of directors, testified that the Corporation was created to hold the City grant funds for the purchase and

10

renovation of the Property. When the Church later embarked upon its mission to build the Head Start Center, all the efforts to secure funding were undertaken by the Church, through the Child First Campaign, with no involvement by the Corporation. Finally, Reverend Hathaway testified that he had understood that upon becoming senior pastor of the Church, in 2007, he also became Chairman of the Corporation's board of directors. He acknowledged that there was no document that gave him that authority, but reasoned that the Corporation merely was a ministry of the Church, so the Church should be able to control it. After becoming senior pastor of the Church, he learned that the Corporation's charter had been forfeited several times. He decided that the board of trustees of the Church should appoint the new, "alternate" board of directors for the Corporation to "bring [the Corporation] into a proper alignment" with the other Church ministries.

On September 12, 2014, the court heard closing arguments and ruled from the bench, making the following findings. Any attempt to consolidate ownership of the Property and the Surrounding Properties had been ineffective, and the Property continued to be owned solely by the Corporation, just as the court in the 2007 tax sale case had ruled.[7] Reverend Hathaway, Mr. Billups, and the "alternate" board had no legal relationship to the Corporation, and lacked capacity to act on its behalf. Therefore, the Corporation was not lawfully revived in March of 2013, and its charter remained

---

[7] The court also ruled that the 2007 judgment on ownership of the Property had *res judicata* effect in this case.

forfeited. The quitclaim deed by the "alternate" board, purporting to transfer the Property from the Corporation to the Church, was void because the "alternate" board had no authority to convey the Property. Likewise, the purported dissolution of the Corporation by Reverend Hathaway and Mr. Billups in March of 2013 was ineffective.

Having made those findings, the court went on to rule:

Now, that leaves the status with a [P]roperty owned by a [C]orporation that is forfeited. On a piece of, underneath the building, most of which lies on the [C]hurch's property, all of the value of which was provided by the [C]hurch through its own efforts and the activities of which are undeniably part of the [C]hurch's mission. I could stop there and do nothing further, but that would leave you in almost the same position you were in [at the conclusion of the tax sale case in 2007].

And without being disapproving, these parties have proved that they cannot resolve their differences further without court action. I choose, therefore, to go a step further and exercise my equitable powers under Section 5-209 of the [CA] Article of the Maryland Code. Because this is a non-stock [C]orporation with charitable purposes, it stands in a unique position because there's no group of shareholders or stockholders who hold the interest, even the defunct [C]orporation's interest, it would certain [sic] be possible at this point, perhaps with some dispute that the [Corporation Parties] could revive the [C]orporation but that would still leave us only in the same situation, just with a revived [C]orporation rather than a defunct corporation.

. . . Section [5-209] wisely gives the Court in cases of last resort, where it is either [im]practicable or inexpedient to continue the [C]orporation's activities, the authority to dispose of forfeit property. One way I could go about this would be to allow the [C]orporation to be revived, appoint a receive [sic] for the [C]orporation and have the receiver lined [sic] up its affairs. That would cost a lot of money. It doesn't strike me as a particularly wise course of action.

In this instance, we have the advantage that it is conceded in these proceedings that the [C]orporation has no assets and no liabilities, so I don't have to worry about a group of debtors who are looking to be satisfied from this [P]roperty or from any other asset. This [P]roperty is the only asset.

12

In this situation, the statute gives me the option of disposing of that [P]roperty, provided that notice to the donor of the [P]roperty is given. I think that is satisfied in this case because the donor, if anything, is the [C]hurch and its members who have paid for the acquisition to the [P]roperty and for the improvements on it. And it also gives me the authority to transfer the [P]roperty to another corporation or association.

I said earlier [during closing arguments] that I did not understand part of the [Corporation Parties'] concern with respect to this particular [P]roperty in terms of the achievement of the . . . Corporation's purposes because I've had no indication that the [C]hurch intends to do anything with this [P]roperty other than continue to use the Head [S]tart Center for the purposes it has been used for the large majority of which stands on [Surrounding Properties] that w[ere] already owned by the [C]hurch, and obviously the intentions may not be forever.

But I'm satisfied that virtually every factor in this case supports the [C]hurch's continued use of the entire Head [S]tart Center for the purposes it's now been used for and other purposes that may come into being, but all of which involve benefitting the community immediately around the Union Baptist Church. And although I found that the [Church Parties] acted contrary to Maryland law in their attempts to resolve the status of the . . . Corporation, I don't have any indication in this record that the [Church Parties] ha[ve] acted contrary to the community's interest or any way to profit from or exploit this [P]roperty other than the same uses that it was created for.

So as a matter of equity, although I have nullified the transfer of the [P]roperty to the [C]hurch, I find that under Section 5-209, it is appropriate to transfer the [P]roperty to the [C]hurch.

Now, again, this could be done through a receiver with a new deed and the cost of recording the deed and so on, but in this case I have not seen any evidence or any indication that the deed that was recorded dated March 20th, [sic] 2013 and recorded, I believe it was June 17th, [sic] 2013 in the land records, who [sic] not otherwise be effective to accomplish that end.

So what I intend to do to save the parties the expenditure of continued expense in this case is to ratify that deed under the separate authority of Section 5-209 which will align all of the properties under the ownership of Union Baptist Church which I think is appropriate, both, because the contiguous properties already are titled in the [C]hurch, and most

13

importantly because the building that sits on them was clearly built by the efforts of the [C]hurch members and others and have been operating in that way.

(Paragraph breaks added.)

In discussion with counsel immediately after announcing its ruling, the court asked the Corporation Parties' lawyer whether he anticipated that the Corporation would continue to exist. He answered, "Yes," explaining that Reverend Dobson's original vision for the community should be continued, "whether it be under the Union Baptist Development Corporation name or some other name." Counsel for the Church Parties responded that she understood the court's ruling to mean "that ultimately there won't be a Union Baptist Development Corporation, that they're free to start another corporation." The court stated that it would consider the issue of dissolution of the Corporation and address it in its written declaratory judgment.

On September 29, 2014, the court entered its declaratory judgment. The judgment tracks the rulings set forth above and further declares that the Corporation is dissolved. In most relevant part, it states:

> [A]lthough the Court has found the revival of [the Corporation by the Church Parties] and its subsequent purported transfer of the [P]roperty to be ineffective, the Court also concludes, as a matter of equity and pursuant to [CA section 5-209], that [the Corporation] should be dissolved and that its sole asset, [the Property], should be transferred to the [Church]; and . . . that it would be wasteful to require that the [Corporation] be revived and then to appoint a receiver to accomplish the property transfer when the end result is the same result accomplished by the otherwise invalid transfer of the property by Quitclaim Deed dated March 20, 2013, and, accordingly, the Court will achieve the appropriate result under [CA section 5-209] by ratifying that Quitclaim Deed; and . . . the Quitclaim Deed dated March 20, 2013, although ineffective at the time to transfer the [P]roperty, is now

14

**DECLARED** to be effective to transfer ownership of [the Property] to [the Church]; and . . . [the Corporation] is **DECLARED** to be **DISSOLVED**[.]

(Emphasis in original.)

On October 14, 2014, the Corporation Parties filed an untimely motion to alter or amend pursuant to Rule 2-534, which did not toll the 30-day deadline in which to file a notice of appeal, *see Furda v. State*, 193 Md. App. 371, 377 (2010), and a motion for sanctions under Rule 1-341. The Corporation Parties did not file a notice of appeal in the 30-day period after entry of the declaratory judgment. As noted, the court treated the motion to alter or amend as a motion for reconsideration under Rule 2-535(a). On December 17, 2014, it entered an order denying that motion and an order denying the Rule 1-341 motion. The Corporation Parties noted an appeal within 30 days of the entry of those orders.

The Corporation Parties present a host of questions for review. As we shall explain, the only issues properly before us are:

I.      Did the trial court abuse its discretion by denying the motion to reconsider its decision to transfer ownership of the Property to the Church and its decision to dissolve the Corporation?

II.     Did the trial court err by denying the Corporation Parties' Rule 1-341 motion for sanctions?

We shall include additional facts as necessary to our discussion of the issues.

**DISCUSSION**

**I.**

**Denial of Motion for Reconsideration**

**(A)**

15

"When a revisory motion is filed beyond the ten-day period, but within thirty days, an appeal noted within thirty days after the court resolves the revisory motion addresses only the issues generated by the revisory motion." *Furda*, 193 Md. App. at 377 n.1; *see also In re Adoption/Guardianship No. 93321055*, 344 Md. 458, 475–76 (1997). A trial court's decision to deny a motion for reconsideration is reviewed for abuse of discretion. *U.S. Life Ins. Co. in City of N.Y. v. Wilson*, 198 Md. App. 452, 464 (2011). "Except to the extent that they are subsumed in [the question whether the trial court abused its discretion in denying the motion for reconsideration], the merits of the judgment itself are not open to direct attack." *Stuples v. Balt. City Police Dep't*, 119 Md. App. 221, 241 (1998) (citations omitted).

"A circuit court abuses its discretion when no reasonable person would take the view adopted by the court, 'or when the court acts without reference to any guiding rules or principles.'" *Kona Props., LLC v. W.D.B. Corp., Inc.*, 224 Md. App. 517, 547 (2015) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997)). "Nevertheless, a 'court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case.'" *Schlotzhauer v. Morton*, 224 Md. App. 72, 84 (2015) (quoting *Arrington v. State*, 411 Md. 524, 552 (2009)), *cert. granted*, 445 Md. 487 (2015). "Consequently, in appeals from the denial of a post-judgment motion, reversal is warranted in cases where there is both an error and a compelling reason to reconsider the underlying ruling." *Id.* at 85 (citations omitted).

In their opening and reply briefs, the Corporation Parties make some arguments that challenge the declaratory judgment; some arguments that challenge the court's denial of the motion for reconsideration, on grounds they did not raise in that motion; and some arguments that challenge the court's denial of their motion for reconsideration, on grounds they did raise in that motion. We shall address the third category of arguments only. The declaratory judgment itself is not subject to attack, for the reasons we have explained, and the trial court could not have abused its discretion by denying the motion for reconsideration based on arguments that were not made to it.

**(B)**

As noted, the Corporation was formed under Maryland law as a nonstock corporation. The nonstock corporation is one of the "Special Types of Corporations" governed by Title 5 of the CA Article. It is covered by Subtitle 2 of that title.[8] Under section 5-201, "[t]he provisions of Maryland General Corporation Law apply to nonstock corporations unless: (1) The context of the provisions clearly requires otherwise; or (2) Specific provisions of this subtitle or other subtitles governing specific classes of corporations provide otherwise." If the nonstock corporation has no members, or neither the charter nor the bylaws provide for members, its directors are its members. CA § 5-204.

_____

[8] The other special types of corporations are professional service corporations (subtitle 1); religious corporations (subtitle 3); private foundations (subtitle 4); agricultural cooperatives (subtitle 5); consumer cooperatives (subtitle 5A); electric cooperatives (subtitle 6); transportation cooperatives (subtitle 6A); housing cooperatives (subtitle 6B); and benefit corporations (subtitle 6C).

17

Section 5-209, entitled "Disposition of property of charitable or religious corporations by the court," provides:

(a) *In general*. – If a charitable or religious corporation is or is about to be dissolved, or for any reason it is impracticable or inexpedient to continue the corporation's activities, a circuit court may order the disposition of corporate property that:

(1) Is not needed to pay the corporation's debts; and

(2) (i) Is not subject to valid requirements for its return to the donor or the donor's successor in interest by reason of the cessation of corporate activities; or

(ii) Is not claimed by the donor or the donor's successor in interest after receiving the notice provided for in subsection (b) of this section.

(b) *Notice.* – Notice of the substance and purpose of the complaint or petition shall be given to the donor of the property or the donor's successor in interest by personal service or by publication in the manner the court directs.

(c) *Transfer of property to another corporation or association*. – To the extent possible, the court shall direct or provide for the transfer of the corporation's property to another corporation or association having a similar or analogous character or purpose, or associated or connected with the corporation.

(d) *Intent of section*. – The intent of this section is that the circuit court may exercise the judicial power of cy-pres to fulfill, despite a change in circumstances, the general intention of the donor of the property for the use of the gift.

**(C)**

In their memorandum in support of their motion for reconsideration, the Corporation Parties argued, with respect to the decision that the Property be transferred to the Church: 1) the Corporation is not a charitable organization, so section 5-209 does not

apply and the court could not invoke it to dispose of the Property; 2) if the Corporation is a charitable organization, it was not "dissolved or about to be dissolved," and there was no finding or evidence to support a finding that it would be "impracticable or inexpedient" to continue its activities; and 3) the money Ms. Sydnor paid to redeem the Corporation's right in the Property in the tax sale case is a debt of the Corporation that it cannot pay if the Property is transferred to the Church without compensation. They allowed that transferring title of the Property to the Church "would quiet the controversy over the [P]roperty," and they would be willing to accept that, but only if they were "*fairly* compensated." (Emphasis in original.) Likewise, they would be "willing to commit to a voluntary dissolution of the Corporation" upon the court's ordering that the Church pay the Corporation "fair market value" for the Property.

In opposition, the Church Parties argued: 1) the evidence supported the trial court's finding that the Corporation was a nonstock corporation with a charitable purpose, to which section 5-209 applied so long as the donor, if any, had notice; 2) the evidence showed that the Corporation obtained title to the Property to advance one of the ministries of the Church, and that ministry was advanced solely by the Church's financial efforts; 3) the Corporation Parties "willingly assented" to the development of the Property as part of the Head Start Center, and the Corporation held the Property in constructive trust for the Church; 4) the court implicitly found that it was "impracticable or inexpedient" for the Corporation to continue in operation; and 5) that finding was supported by evidence that the Corporation had not functioned for decades, had no assets (other than the Property), no liabilities, and no ongoing activities, that the Property was

19

not needed to pay any debt of the Corporation and was not subject to any donor restrictions as to its use or disposition, and that all persons claiming interest in the Property were on notice of its disposition.[9]

The Church Parties further argued that section 5-209(d) authorized the trial court, under the doctrine of *cy pres*, to transfer the Property to the Church to use to continue to operate the Head Start Program.[10] They maintained that the court could use its general equitable powers to transfer title of the Property to the Church, without compensation to the Corporation. They pointed out that at no time during the trial did the Corporation Parties present any evidence about the fair market value of the Property. Indeed, they made no claim for compensation and the court made a finding, which was supported by the evidence, that the Church had paid all the expenses associated with the Property.

**(D)**

As mentioned, the Corporation Parties contend the court abused its discretion by denying their motion to reconsider the ruling transferring the Property to the Church pursuant to section 5-209 because the Corporation is a not a charitable organization and therefore the court lacked authority to transfer the Property under that statute. They take

---

[9] The Church Parties pointed out that Kim Sydnor did not testify that the Corporation owed her any debt with respect to the tax sale redemption, and there was no evidence of such a debt; nor was there any such evidence in the tax sale case.

[10] *Cy pres* is "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." *Black's Law Dictionary* (10th ed. 2014). *Cf.* Md. Code (1974, 2011 Repl. Vol.), section 14-302 of the Estates & Trusts Article (adopting *cy pres* doctrine for administration of charitable trusts).

20

the position that, to be a charitable organization, a corporation must have tax-exempt status under section 501(c)(3) of the Internal Revenue Code. In support, they point to Md. Code (1973, 2013 Repl. Vol.), section 5-407(a)(4) of the Courts and Judicial Proceedings Article ("CJP"), "Charitable organizations and volunteers," which defines a charitable organization as "an organization, institution, association, society, or corporation that is exempt from taxation under [section] 501(c)(3) of the Internal Revenue Code." They also maintain that *Supervisor of Assessments of Montgomery County v. Group Health Assoc., Inc.*, 308 Md. 151 (1986), supports their position.

The Church Parties respond that an organization need not have tax-exempt status under the Internal Revenue Code to be a charitable organization, and there was sufficient evidence in the record that the Corporation was formed and operated for charitable purposes. They maintain that the *Group Health* case is inapposite.

The definition of "charitable organization" in CJP section 5-407(a)(4) is specific to that statute, which addresses the circumstances in which volunteer officers, directors, trustees, and others who provide services or perform duties for certain associations or organizations, may be held liable in tort. The statute has no bearing on any issue in this case, and there is no reason why it should control the question whether the Corporation is a charitable organization for purposes of CA section 5-209.

We disagree with the Church Parties that the *Group Health* case is inapposite, but we also disagree with the Corporation Parties that the case supports their position. In *Group Health*, a non-profit Health Maintenance Organization ("HMO") applied to the Supervisor of Assessments of Montgomery County for a property tax exemption on the

21

ground that it was a charitable organization. When the application was denied, the HMO challenged the decision within the agency, unsuccessfully, and then appealed to the Maryland Tax Court. There it introduced evidence that it had obtained federal tax-exempt status as a charitable organization and argued that that entitled it to the property tax exemption. In addition, it argued that it was a charitable organization because it was providing affordable health care to 50,000 to 60,000 Maryland residents; was giving them a means to obtain comprehensive health care while curbing health care costs; was providing a benefit to all Maryland residents by exerting downward pressure on health care costs; and was educating its members about health care. The Supervisor introduced evidence that the HMO only was providing services to its members, not to Maryland residents at large, and was using fees collected from members, not donations, to provide services.

The Tax Court found that the benefit the HMO was affording the public was secondary to the benefit it was affording its own members, employees, and doctors. Accordingly, the HMO was not providing a sufficient benefit to the community to justify a charitable exemption from property taxes.

In an action for judicial review, the circuit court reversed. The Court of Appeals granted the Supervisor's petition for writ of *certiorari* before this Court rendered a decision on appeal. It affirmed the Tax Court's decision. Explaining that it probably is impossible to formulate a general rule by which to decide when an organization is charitable, it observed:

22

> [A] determination of whether an institution is charitable must include a careful examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations.

308 Md. at 157 (citations omitted). The Court held that, even though the underlying facts were not in dispute, the question whether the HMO was a charitable organization was one of fact, not of law, and there was substantial evidence before the Tax Court to support its finding that the HMO was not a charitable organization entitled to tax-exempt status.

*Group Health* makes plain that an organization's federal tax-exempt status does not dictate whether it is a charitable organization under Maryland law. There, the HMO held a charitable exemption from federal taxes, but was found not to have a charitable purpose so as to justify an exemption from state property taxes. This same principle would hold that an organization that does not have a charitable exemption from federal taxes is not necessarily a non-charitable organization for state law purposes. That is especially true when the organization never attempted to obtain tax exempt status under federal law.

The holding in *Group Health* is consistent with the reasoning of the Supreme Court in *Bob Jones University v. United States*, 461 U.S. 574 (1983), in which the Court held that a non-profit private university that invoked religious doctrine to apply racially discriminatory admissions standards did not qualify for tax-exempt status under section 501(c)(3) of the Internal Revenue Code. The Court explained that whether an organization is charitable, so as to be entitled to receive the benefits of that statute, depends on standards of charity. The origins of tax exemptions for "certain institutions

23

thought beneficial to the social order of the country as a whole, or to a particular community . . . lie in the special privileges that long have been extended to charitable trusts." *Id*. at 588 (footnote omitted).

From the framework of the Internal Revenue Code and its purposes, the Court ascertained that Congress intended that an organization's entitlement to a tax exemption "depends on meeting certain common law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Id*. at 586.

> Congress's intention . . . to provide tax benefits to organizations serving charitable purposes [was] to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind.

*Id.* at 587–88 (footnote omitted). Indeed, the Court had long recognized this intention. *See Trinidad v. Sagrada Orden*, 263 U.S. 578, 581 (1924) (observing that "[e]vidently the exemption [for charitable organizations] is made in recognition of the benefit which the public derives from corporate activities [of charities], and is intended to aid them when not conducted for private gain").

The common law standards of charity as explained by the Supreme Court in *Bob Jones University*, and the considerations determining whether an institution is charitable as discussed by the Court of Appeals in *Group Home*, support the trial court's finding that the Corporation is a charitable organization. The Corporation's purposes, spelled out in its Articles of Incorporation, were to stabilize and restore the 1200 Block of Druid Hill Avenue and the surrounding neighborhood by acquiring and rehabilitating residential

24

units; to purchase and restore the Property for use as a coffee house for the elderly in the community; and to engage in other acts, ventures and businesses so long as they are not for profit. Clearly, these purposes were to serve the public good. The only actual work performed by the Corporation was the rehabilitation of the Property into a coffee shop for the elderly in the community. The purchase of the Property and the work to rehabilitate it was funded entirely by a grant from the City to the Church, made to serve the public good as well.

From the time the rehabilitated row house on the Property was razed until the time of trial, which comprises most of the Corporation's existence, the Corporation has not engaged in any activities to speak of. The Surrounding Properties were donated to the Church, not to the Corporation; and the Corporation did not participate in the Child First Campaign or any other fundraising endeavor to finance the Head Start Center on the Property and the Surrounding Properties. The Corporation merely agreed that the rehabilitated row house on the Property would be torn down and the Head Start Center would be built on it and the Surrounding Properties together. To the extent the Corporation's agreement in this regard was an activity on its part, that activity benefited the community and served the public good.

Even though the Corporation has been inactive for decades, its purpose has remained charitable, and the activities in which it once engaged were charitable in nature. The trial court did not err in finding that the Corporation was a charitable organization, notwithstanding that it did not have tax-exempt status under the Internal Revenue Code.

25

As they did below, the Corporation Parties argue that if the Corporation is a charitable organization, the trial court erred in disposing of the Property, its sole asset, under section 5-209, without making a finding that the Corporation was "dissolved or about to be dissolved" or that "for any reason it is impracticable or inexpedient to continue the corporation's activities"; and the evidence would not support either such finding. Therefore, the court abused its discretion by denying the motion for reconsideration on that ground. And as they did below, the Church Parties respond that the court made an implicit finding that it was "impracticable or inexpedient to continue the [C]orporation's activities," the evidence supported that finding, and the trial court did not abuse its discretion by denying the motion for reconsideration on that ground.

The court did not base its decision to transfer the Property to the Church under section 5-209 on a finding that the Corporation was dissolved or about to be dissolved. It made no such finding, as is evident from the conversation between the judge and counsel immediately after the ruling from the bench. Rather, as a lead-in to its transfer decision, the court explained several circumstances that made its (the Corporation's) continuation impracticable: it was formed to receive the City grant money that funded the Church's first "coffee house" neighborhood ministry project and to take title to the Property, because the City would not allow the Church to be the recipient of the grant; the coffee house project was replaced by the Head Start Center project, and all the money that paid for the construction of the Head Start Center, including the $1,000,000 grant from the State and the money to match that grant, was raised and received by the Church; and the

26

coffee house later was razed and the Property became a small portion of the ground on which the Head Start Center was built.

The Corporation Parties are correct that the court did not make a clear express finding that it was impracticable to continue the Corporation's activities. It made that finding implicitly, however. In discussing section 5-209, the court specifically referenced the "impracticable or inexpedient to continue the corporation's activities" standard in subsection (a) and proceeded to make findings related to the impracticability aspect of that standard. It would not have made those related findings if it had not found that the standard was met. It determined that the Property was not needed to pay any debt of the Corporation, as it had no debts, a consideration under (a)(1); and, under subsection (b), that the Church was the donor of the Property and was on notice of the proceedings.[11] Further apropos of the "impracticable" to continue the corporation's activities standard, the court commented that the evidence showed that the Head Start Center, most of which is owned by the Church, has been operated by the Church for over twenty years and that the Corporation Parties have no intention to put the Property, *i.e.*, the small part of the Head Start Center the Corporation owns, to any different use (which would likely be

---

[11] The court did not address subsection (a)(2), probably because its finding that the Church was the donor of the Property to the Corporation made that provision inapplicable. Subsection (a)(2) is relevant only if the donor of the property in question is not the same person or entity as the person or entity the court will be ordering the property transferred to. If, in that circumstance, the owner of the property is required to return it to the donor, the court may not transfer the property to a third party.

27

impossible anyway). These findings support the trial court's ultimate conclusion that it was impracticable to continue the Corporation's activities.

Additional evidence in the record supports the court's conclusion as well. The Corporation has not engaged in any activities since early after it was formed, in 1981, other than to hold the funds granted by the City for the original coffee house project, which no longer exits, and to hold title to the Property for the Church, only because the City would not allow its grant money to be used to transfer title of the Property to a religious corporation. Ms. Dobson testified that the Corporation had been essentially inactive for most of its existence:

- Its charter was forfeited for a total of almost 25 years, during which it did nothing, and in its most recent period of revival, from 2005 to 2012, it also did nothing;

- From the time of the City grant in 1981, the Corporation had no income and no debts and engaged in no fundraising activities;

- The original coffee house (and the laundromat built soon after) ceased operations and were demolished in the early 1990s, to be replaced by the Head Start Center, which the Corporation did not raise money for or operate and still operates today with no involvement of the Corporation; and

- Any contributions to the Corporation came from members of its own board.

The sum and substance of all the evidence about the Corporation was that it was formed to hold the Church's City grant money and title to the Property because of rules imposed by the City; that it had not engaged in any activities to support the neighborhood for decades; and that the only activity it had engaged in for decades was litigation over the Property, which did not serve any charitable or other useful purpose, did not advance

any of the purposes for which the Corporation was formed, and, on the contrary, detracted from those purposes.

There also was ample support in the evidence for the court's decision that the Church be the recipient of the transfer. The Church was the donor of the Property to the Corporation; the City grant money that was used to buy the Property belonged to the Church; and the entire purpose of forming the Corporation and titling the Property in its name was to advance the Church's neighborhood ministry, which is still being carried out today by the Church, through its operation of the Head Start Center, of which the Property is a small part. Section 5-209(c) provides that "to the extent possible, the court shall direct or provide for the transfer of the corporation's property to another corporation or association having a similar or analogous character or purpose, or associated or connected with the corporation." The selection of the Church satisfies these criteria.

In addition, the selection of the Church as the recipient of the Property satisfies the "intent" of section 5-209(d), which "is that the circuit court may exercise the judicial power of cy-pres to fulfill, despite the change in circumstances, the general intention of the donor of the property for the use of the gift." The intention of the Church, as the donor, was that the Property would be held by the Corporation in order to fulfill the Church's neighborhood ministry. That ministry will be served by the transfer of the Property back to its donor. Moreover, although the court's ruling was not based on dissolution, the transfer to the Church also is consistent with the intention of the Corporation that, upon dissolution, its assets shall be disposed of by the board of directors to further the purposes of the Corporation or to an organization operated for charitable or

29

religious purposes; and any assets not disposed of shall be disposed of by the Circuit Court for Baltimore City to such organizations for such purposes.

As discussed above, the Corporation Parties asserted for the first time in their motion for reconsideration that the Corporation owes a debt to Ms. Sydnor because she personally paid to redeem the Property in the tax sale, and that it is unfair to the Corporation, as owner of the Property, to take it away without payment of compensation. On the first point, at no time in her trial testimony did Ms. Sydnor so much as suggest that the Corporation owed her the money she paid in connection with the tax sale. Indeed, the Corporation Parties' counsel conceded that the Corporation had no liabilities whatsoever. As part of its pattern of non-activity, the Corporation never got around to taking the steps to become tax exempt; if it had, it (like the Church) would not have been obligated to pay property taxes. During the decades that the Corporation owned the Property, the Church paid the property taxes for it, without any obligation to do so, until, in 2004, the Church was unable to. Assuming the truth of Ms. Sydnor's assertion that she paid the property tax redemption sum in 2007, there was nothing to show that this was anything other than a gift to the Corporation, as the Church's prior payments had been gifts.

On the second point, respecting payment of compensation to the Corporation for the Property, the court invoked section 5-209 in part because, as we have explained, the Corporation, in effect, was a trustee over the Property for the benefit of the Church. The Corporation did not apply for the City grant money in 1981; did not receive it from the City; held the grant money for the Church's benefit; did not use the grant money other

30

than as directed by the Church; and did not participate in any activities through which the Property later was developed into the Head Start Center. We note, moreover, that the Corporation Parties did not raise the issue of compensation for the Property at trial, raising it for the first time in their motion for reconsideration, and then without presenting any evidence of value. In the circumstances, the court did not abuse its discretion in denying the motion for reconsideration of its decision to transfer the Property to the Church, pursuant to section 5-209.

## (F)

"The power to dissolve a corporation is exclusively governed by statute. 'Apart from statutory power, a court of equity cannot dissolve a corporation.'" James J. Hanks, Jr., *Maryland Corporation Law* § 11.1 at 346 (Wolters Kluwer, 2008 Supp.) (quoting *Mason v. Sup. Ct. of the Equitable League*, 77 Md. 483, 484 (1893)). "Historically, Maryland has been reluctant to expand the equity jurisdiction of courts to include the ability to grant petitions for involuntary dissolution of a corporation without express authorization by statute." *Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 47 (2005) (footnote omitted) (citing *Mason,* 77 Md. at 484).

Except as otherwise provided in section 5-208, the dissolution of a nonstock corporation "shall be effected as provided in Title 3" of the CA Article. CA § 5-208(a). Dissolution may be voluntary, under sections 3-402 and 3-403, which do not apply here, or involuntary, under section 3-413. A court only may dissolve a corporation

31

involuntarily upon a petition by stockholders or creditors and upon proof of one of the grounds specified. CA § 3-413.[12] There is no statutory provision authorizing a court to dissolve a corporation involuntarily absent a petition for involuntary dissolution filed by stockholders or creditors.[13]

Section 5-208(b) does not authorize a court to dissolve a nonstock corporation. Rather, it directs how, in particular circumstances, the liabilities, obligations, and assets of a nonstock corporation are to be treated upon dissolution of the corporation.[14]

---

[12] Any stockholder or creditor of a corporation, other than a railroad, may petition for involuntary dissolution on the ground that the corporation is unable to meet its debt as they mature in the ordinary course of business. CA § 3-413(c). Ordinarily, any stockholder with voting power may petition for involuntary dissolution on the grounds that the stockholders are so divided that they have failed, for a specified time period, to elect successors to directors whose terms would have expired, or the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent. *Id.* at § 3-413(b). Finally, ordinarily, stockholders with at least 25 percent voting power may petition for dissolution of the corporation on the ground that the directors are so divided that the votes for board action cannot be obtained or the stockholders are so divided that directors cannot be elected. *Id.* at § 3-413(a).

[13] A corporation whose charter is forfeited for nonpayment of taxes or failure to file a report, under CA section 3-503, ceases to exist, and is effectively dissolved. *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 163 (2004); *see also Tri-County Unlimited Inc. v. Kids First Swim School Inc.*, 191 Md. App. 612, 621 (2010). However, its existence can be revived upon the filing of articles of revival. *See* CA §§ 3-507–3-512. So, although the Corporation ceased to exist when its charter was forfeited in 2012, and was not revived when articles of revival were filed by those without any authority to do so, it still could be revived by articles filed in accordance with CA §§ 3-507 and 3-508.

[14] Section 5-208(b) directs that when a nonstock corporation is dissolved:

(1) Every liability and obligation of the corporation shall be paid and discharged or adequate provision for payment and discharge shall be made;

(Continued…)

As they did in their motion for reconsideration, the Corporation Parties contend that a dissolution of the Corporation is governed by the provisions in Title 3 of the CA Article and is not within the equitable power of the court to accomplish outside those statutory provisions. Specifically, the court only was authorized to involuntarily dissolve the Corporation upon petition by its stockholders (of which it had none) or its creditors, and no such petition was filed. They assert that section 5-208(b), which governs the distribution of assets of a nonstock corporation upon dissolution, does not authorize a court to dissolve a corporation on its own or to distribute its assets. They argue that, in

_____

(…continued)

    (2) Assets held by the corporation subject to legally valid requirements for their return, transfer, or conveyance on dissolution or forfeiture shall be disposed of in accordance with these requirements;

    (3) Assets held by the corporation subject to limitations permitting their use only for charitable, religious, eleemosynary, benevolent, educational, or similar purposes [but not covered by (2)], shall be transferred or conveyed under a plan of distribution, adopted in the manner and by the vote required for authorization of dissolution of the corporation, to one or more Maryland or foreign corporations or associations having a similar or analogous character and purpose, or associated or connected with the corporation;

    (4) Other assets shall be distributed as provided in the charter or the bylaws to the extent that the charter or bylaws determine the distributive rights of members or any class or classes of members, or provide for distribution to others; and

    (5) Any remaining assets may be distributed to any person, society, organization, or Maryland or foreign corporation specified in a plan of distribution, adopted in the manner and by the vote required for authorization of dissolution of the corporation.

33

ruling on the motion for reconsideration, the court should have recognized that it was without any legal authority to dissolve the Corporation and should have granted the motion on that ground, as to dissolution.

The Church Parties do not argue in this Court that the trial court had the authority to dissolve the Corporation. They emphasize:

> To be clear, the trial court did not need to dissolve the [C]orporation to trigger [the court's] authority pursuant to section 5-209 although it ultimately determined to do so. The trial court had the authority to transfer the Corporation's property on finding that it is impracticable or inexpedient to continue the [C]orporation's activities.

We agree with the Corporation Parties that the trial court abused its discretion in denying the motion for reconsideration respecting dissolution. The Court of Appeals "has recognized that trial judges do not have discretion to apply inappropriate legal standards, even when making decisions that are regarded as discretionary in nature." *Wilson-X v. Department of Human* Resources, 403 Md. 667, 675 (2008). The *Wilson* Court explained:

> In *Pasteur v. Skevofilax*, 396 Md. 405, 433, 914 A.2d 113, 130 (2007), we confirmed that "a failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion." *See also Ehrlich v. Perez*, 394 Md. 691, 708, 908 A.2d 1220, 1230 (2006), citing *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301, 849 A.2d 451, 459 (2004), and *Alston v. Alston*, 331 Md. 496, 504, 629 A.2d 70, 74 (1993), for the proposition that "even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards."

*Id.* at 675-76.

In *Wilson*, for example, a father who was receiving SSI benefits and was ordered to pay child support filed a Rule 2-535(a) motion for reconsideration, which was denied,

and timely appealed only from that ruling. In his motion for reconsideration, the father argued that the court had acted contrary to law by including his SSI benefits as income in calculating his child support obligation. Despite recognizing that a ruling denying a motion for reconsideration could be an abuse of discretion if the original ruling were based on an error of law, the Court of Appeals was not persuaded that the original ruling was based on an error of law, and therefore, affirmed the denial of the motion for reconsideration.

This case stands in contrast to *Wilson*. The issue of dissolution of the Corporation first came up after the court announced its ruling from the bench. It had not been argued or briefed to the court, nor did the court consider it in reaching its declaratory judgment decision. In that decision, the court stated that the Corporation would be dissolved "as a matter of equity and pursuant to" section 5-209. The motion for reconsideration was the first opportunity for any party to address the legality of the court's decision to dissolve the Corporation. The law is clear that a circuit court lacks the inherent equitable power to dissolve a corporation and that neither section 5-208 nor section 5-209 grant a circuit court the power to dissolve a nonstock corporation. In these circumstances, it was an abuse of discretion for the trial court to decline to correct its prior decision, which was legally incorrect. *See U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 464 (2011) ("A decision that is legally incorrect is an abuse of discretion.").

## II.

## Denial of Rule 1-341 Motion

As relevant, Rule 1-341(a) provides:

35

> In any civil action, if the court finds that the conduct of any party in . . . defending any proceeding was in bad faith or without substantial justification, the court, on motion of the adverse party, may require the offending party . . . to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing it.

A court's finding that there was (or was not) bad faith or lack of substantial justification on the part of a party in prosecuting or defending a proceeding is reviewed on appeal for clear error. *Inlet Assocs. v. Harrison Inn Inlet, Inc.*, 324 Md. 254, 267 (1991). If the court finds bad faith or lack of substantial justification, its decision to award (or not award) fees is reviewed for abuse of discretion. *Id.* at 268.

In their memorandum in support of their motion for attorneys' fees under Rule 1-341, the Corporation Parties alleged that the Church Parties had acted in bad faith and without substantial justification in defending the action. In particular, they asserted that the court's finding that the Church Parties, through the "alternate" board of directors, had acted on behalf of the Corporation when they had no legal authority to do so was the equivalent of finding that the Church Parties had acted in bad faith and without substantial justification in defending the Corporation Parties' action. The Church Parties filed an opposition.

On December 17, 2014, the court entered an order denying the motion for fees, without a hearing. The court stated:

> As [the Corporation Parties] acknowledge [in their motion], to warrant an award of attorney[s'] fees and costs, [they] would have to show that [the Church Parties'] conduct in defending this action was either "in bad faith or without substantial justification." Md. Rule 1-341(a). This action presented difficult factual and legal issues, and [the Church Parties] substantially prevailed in the ultimate relief awarded. [The Corporation

36

Parties] therefore have not made the showing required by Maryland Rule 1-341.

In a similar argument to that advanced below, the Corporation Parties contend on appeal that the court's factual findings on the disputes before it amounted to a finding of bad faith and lack of substantial justification on the Church's part in defending the action; that those findings were not clearly erroneous; and that, having made the necessary findings, the court abused its discretion by declining to award fees. This contention has no merit.

Contrary to the Corporation Parties' argument, the trial court did not find that the Church Parties acted in bad faith and without substantial justification in defending the proceeding. It made the opposite finding—that they had not acted in bad faith or without substantial justification. A court's factual finding against a party on a dispute going to the merits of the action is not tantamount to finding that that party pursued or defended the action in bad faith or without substantial justification. It does not follow from the court's finding that the Church did not have the authority to create an "alternate" board of directors for the Corporation that the Church Parties acted in bad faith or without substantial justification in defending this action.

To successfully challenge the court's ruling on their Rule 1-341 motion, it is incumbent upon the Corporation Parties to present a meritorious argument that the court's findings that the Church Parties did not act in bad faith or without substantial justification in defending the action were clearly erroneous. They have not presented any such

argument, let alone a meritorious one.  Accordingly, we shall not disturb the court's fee ruling.[15]

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY DISSOLVING THE UNION BAPTIST DEVELOPMENT CORPORATION REVERSED; JUDGMENTS OTHERWISE AFFIRMED.**
>
> **COSTS TO BE PAID ONE-HALF BY THE APPELLANTS AND ONE-HALF BY THE APPELLEES.**

---

[15] Soon after oral argument, the Corporation Parties filed a "Submission for Consideration of the Court After Oral Proceedings."  The Church Parties filed a motion to strike.  We agree with the Church Parties that the Corporation Parties' filing is in the nature of a supplemental brief, and there is nothing in the Maryland Rules to permit such a filing.  Accordingly, we shall grant the motion to strike.

During the briefing period in this appeal, the Church Parties filed a motion to strike the record extract.  The Corporation Parties filed an opposition and the Church Parties filed a reply.  We exercise our discretion to deny that motion.